**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LIANE MCDONALD** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 16-264** |
| | : | |
| **WELLS FARGO BANK, N.A.** | : | |

# <u>MEMORANDUM</u>

**KEARNEY, J.** <span style="float:right">**April 16, 2019**</span>

An auto lender repossessing a car must comply with a state's commercial code and related debtor protections. These laws define disclosures required in the notices of repossession and deficiency sent to the debtor to further the legislature's mandate of all aspects of the lender's repossession and sale conduct are commercially reasonable. The lender may send the same notice to thousands of defaulted debtors in the same state based on the state's law. The auto lender's compliance is made more complicated when the car is purchased from a car dealer in one state for use by a citizen of a different state. Assessing compliance also becomes more complicated when the debtor dies but someone keeps sending the monthly car payment for years until defaulting shortly before the last payment. What state's notice requirements apply? Is a deceased debtor entitled to proper notice? After our Court of Appeals held the debtor's estate may bring commercial code or conversion claims under Pennsylvania law (if it applies), we today address whether the estate of a Pennsylvania debtor who bought a car in Ohio may pursue claims under Article 9 of the Pennsylvania Commercial Code challenging the repossession and deficiency notices sent to the deceased debtor or for conversion for repossessing the car. If so, may we certify a class of over 300 Pennsylvania debtors who lost a car to repossession after this lender sent a

notice (based on the car dealer's home state law) not compliant with Pennsylvania's Commercial Code or under Pennsylvania conversion law?

We find disputed issues of fact requiring a trial on some but not all of the debtor estate's Article 9 challenges to the lender's two pre-sale notices and for conversion. But we cannot certify a class as the individual reasonableness and consent issues predominate over the common issues and a class action is not a superior method of resolving the individual liability questions. Even assuming we could possibly find predominance and superiority, we could not certify this proposed class as the unique defenses to the debtor's estate renders it atypical under class action law. We also deny eight Pennsylvanians' effort to intervene, without prejudice for them to seek their remedies if timely when the estate filed this case.

## I.     Background

### A.     Facts adduced in discovery.

Pennsylvania citizen Rick McDonald wanted to buy a GMC Sierra truck in early 2007 but needed his mother Patricia McDonald to assist with payments.[1] Patricia McDonald ended up buying a 2002 GMC Sierra from Performance GMC, a car dealership in New Waterford, Ohio, in April 2007.[2] Neither Patricia McDonald nor Rick McDonald ever set foot in Performance GMC's Ohio dealership.[3] Rick McDonald negotiated the purchase over the phone from Pennsylvania,[4] and Performance GMC delivered the truck to the Pennsylvania ice rink where he worked.[5] Patricia McDonald executed necessary documents at the rink or received, signed, and returned documents by mail.[6]

Patricia McDonald financed the purchase of the five-year-old GMC Sierra. She signed a Retail Installment Sale Contract ("the Contract") with the Ohio dealership, governed by Ohio law, requiring she make sixty-six monthly installments of $465.86.[7] Patricia McDonald agreed to make

the first of sixty-six payments on May 26, 2017, with her last payment due on October 26, 2012.[8]
The parties agreed Patricia McDonald's failure to cure a late payment in under thirty days could
result in Wells Fargo "demand[ing] that [she] pay all that [she] owe on th[e] contract."[9]  The top
portion of the Contract contains several "Federal Truth-In-Lending Disclosures," one of which
states the finance charge—the "amount the credit will cost you"—is $6,930.86.[10]   Another
disclosure lists the total amount financed is $23,815.90.[11]  The bottom portion of the Contract
provides "Seller assigns its interest in this contract to Wells Fargo Auto Finance, Inc."[12]  Patricia
McDonald then became obligated to make her sixty-six monthly payments to Wells Fargo Auto
Finance, Inc., a South Dakota company.[13]

### Wells Fargo repossesses the GMC Sierra on November 28, 2012.

Patricia McDonald died on December 21, 2009.[14]  Someone continued making her monthly
payments for well over two years after her passing.  Wells Fargo claims it did not know of her
passing because Rick McDonald "affirmatively misled Wells Fargo into believing that Patricia
was still alive."[15]  Patricia McDonald's account fell into default in August 2012.[16]  Wells Fargo
repossessed the vehicle on November 28, 2012.[17]  The parties dispute Patricia McDonald's right
to reinstate the loan at the time of repossession, even though Wells Fargo's November 30, 2012
Notice informed Patricia McDonald she could reinstate the loan until December 20, 2012.[18]

### Wells Fargo's two Notices of sale for the repossessed 2002 GMC Sierra.

Wells Fargo sent Patricia McDonald a "Notice of Our Plan to Sell Property (Consumer
Goods)" on November 30, 2012.[19]  The November 30, 2012 Notice informed Patricia McDonald
Wells Fargo "will sell" the GMC Sierra "at public sale at a minimum bid of 9,157.00" on Thursday
January 3, 2013 at 1:00 P.M. at Manheim Ohio, 3905 Jackson Pike, Grove City, Ohio 43123.[20]
The Notice listed a Wells Fargo phone number and address numerous times in the event Patricia

McDonald: (i) sought to "get the property back at any time before" the sale, (ii) wanted Wells Fargo "to explain . . . in writing how [Wells Fargo] ha[d] figured the amount" she owed, or (iii) "need[ed] more information about the sale."[21]   On the second page of the Notice, Wells Fargo informed Patricia McDonald "[p]ayment is due for the months of 08/06/12, THROUGH, 11/06/12."[22]   The notice listed a "Total Amount Due" of $2,862.75.[23]   Wells Fargo informed Patricia McDonald she could "reinstate this default until" December 20, 2012 by paying the $2,862.75 due on the account.[24]   Reinstatement, the Notice said, would have allowed Patricia McDonald to "continue with the contract as though there had been no default."[25]

Wells Fargo did not sell the GMC Sierra at the January 3, 2013 auction.  On January 4, 2013, Wells Fargo sent Patricia McDonald a "Notice of Continued Sale" informing her Wells Fargo Dealer Services "attempted" but "was not able to sell your vehicle" at the originally scheduled auction "and we have scheduled another public sale date"[26]:

> You are hereby notified that Wells Fargo Dealer Services attempted to sell your 2002 GMC SIERRA 1GTHK29182E291423 on 01/03/13, at MANHEIM OHIO Auto Auction. Wells Fargo Dealer Services was not able to sell your vehicle and we have scheduled another public sale date.
>
> Your vehicle is scheduled to sell at MANHEIM OHIO Auto Auction, 3905JACKSON PIKE GROVE CITY OH 43123-9731 on 01/22/13, at 12:00PM. This sale is open to the public and you are encouraged to attend.
>
> If you have any questions please contact the Wells Fargo Dealer Services office listed below:
>
> Reinstatements, E2578-021
> Wells Fargo Dealer Services
> P.O. Box 3659
> Rancho Cucamonga, CA 91729
> 888-937-9992

The January 4, 2013 Notice did not describe a lower minimum bid.  Liane McDonald, Patricia McDonald's daughter-in-law, swore she does not remember seeing the January 4, 2013 Notice of Continued Sale, as the McDonalds' employee, Sam Betts, signed for it.[27]   But Liane

McDonald admits Sam Betts's signature is on the return receipt and she "would like to think" Sam Betts provided them the mail if and when he retrieved it.[28]

Wells Fargo sold the GMC Sierra for $3,400 at the January 22, 2013 auction.[29]

### Wells Fargo's January 27, 2013 deficiency Notice.

In a January 27, 2013 deficiency Notice, Wells Fargo informed Patricia McDonald of the January 22, 2013 sale and a deficiency balance of $292.89 after applying the sale's proceeds.[30] The notice contained a detailed accounting:

| | |
|---|---:|
| A. Aggregate amount of obligations secured as of November 28, 2012, the date of repossession   (Includes current principal balance due and finance charges accrued as of the date of repossession, and reflects certain credits due under state law*) | $2,238.10 |
| B. Accrued finance charges, late fees and charges not included in "A," as of the date of this letter | $634.79 |
| C. Less rebate of unearned finance charges or credit service charge, if any | $0.00 |
| D. Subtotal ("A" plus "B" minus "C") | $2,872.89 |
| E. Gross Proceeds from disposition or sale | $3,400.00 |
| F. Balance remaining after applying sale proceeds ("D" minus "E") | ($527.11) |
| G. Costs of repossession | $350.00 |
| H. Storage expenses | $0.00 |
| I. Costs of preparation and sale | $470.00 |
| J. Attorney's Fees/Legal Expenses, as permitted by law | $0.00 |
| K. Subtotal of Costs of Repossession and Sale ("G" plus "H" plus "I" plus "J") | $820.00 |
| L. Credits not included in "A," including insurance and other rebates, if any | $0.00 |
| M. Amount of Deficiency or (Surplus) After Sale ("F" Plus "K" minus "L")** | $292.89 |
| **Deficiency Balance You Must Pay or (Surplus) to be Paid to You** | $292.89 |

Over a month after the sale, Erik Sobkiewicz, Esq. wrote to Wells Fargo on behalf of the deceased Patricia McDonald.[31] Despite her 2009 death, Attorney Sobkiewicz stated he "represent[s] Patricia A. McDonald" and "Ms. McDonald provided me with the [deficiency] notice."[32] This is false. Attorney Sobkiewicz requested Wells Fargo "explain why, despite committing to sell the vehicle for not less than $9,157.00, you nonetheless sold it for $3,400."[33] Attorney Sobkiewicz also requested "an accounting substantiating the $2,238.10 that you claim was due as of November 28, 2012," because "[t]he individual who repossessed the vehicle

indicated that his paperwork showed that only between $300 and $400 was outstanding on the note."[34]  Liane McDonald swore either she or her husband Rick authorized Attorney Sobkiewicz, a family friend, to send Wells Fargo the letter.[35]

### B.    The Estate sues Wells Fargo.

On December 31, 2015, Liane McDonald obtained Letters of Administration for her mother-in-law Patricia McDonald's estate ("the Estate").[36]  In January 2016, Liane McDonald, acting in her capacity as Administratrix of Patricia A. McDonald's Estate, sued Wells Fargo.[37]  She alleged violations of Pennsylvania's Commercial Code and the now-repealed Motor Vehicle Sales Finance Act ("MVSFA").  The Estate sought to represent a class of similarly situated individuals. The Estate then filed an Amended Class Action Complaint— the operative complaint in this action—adding additional theories of liability.  The Estate alleges breach of contract, violations of Pennsylvania's protections for defaulting debtors in Article 9 of the Pennsylvania Commercial Code and the MVSFA, and conversion (premised on Wells Fargo's repossession and sale of the GMC Sierra with insufficient notice).

The Estate focuses its claims on Wells Fargo's November 30, 2012, January 4, 2013, and January 27, 2013 Notices.  The Estate alleges Wells Fargo's conduct violated Commercial Code section 9610, which requires "[e]very aspect of a disposition of collateral . . . be commercially reasonable,"[38] and Commercial Code sections 9614 and 9616, which require pre-sale and deficiency notices contain certain minimally necessary information to allow debtors to protect their interests in the collateral. The Estate claims Wells Fargo's Notices fall short of Article 9's requirements in several ways.  The Estate alleges Wells Fargo's November 30, 2012 and January 4, 2013 pre-sale Notices "merely advised the borrower that the vehicle would be sold at a 'public sale' without describing the nature of that sale," and failed to "tell the borrower what [it] would

charge the borrower if the borrower sought an accounting of the loan history."[39]  The Estate alleges Wells Fargo "routinely sold vehicles at public auction on a date that was different than the sale date that the Defendant originally provided to its borrower," and ultimately "accepted less than the minimum bid that it had committed to its borrower that it would accept."[40]  The Estate alleges Wells Fargo failed to provide in its January 27, 2013 deficiency Notice "a telephone number or mailing address from which additional information regarding the transactions disposing of such members' vehicles was available."[41]

Invoking (but not specifically alleging claims under) the MVSFA's notice requirements applicable to motor vehicle repossessions, the Estate alleges Wells Fargo "did not set forth the amount that the borrower must pay to redeem the repossessed vehicle[,] contained conflicting information as to the borrower's reinstatement and redemption rights[,] and failed to notify the borrower of the borrower's right to reclaim personal property that was in the vehicle at the time it was repossessed."[42]  The Estate also claims Wells Fargo's failure to recant the minimum bid term in the second pre-sale notice rendered the notice and sale commercially unreasonable.

### C. Following our dismissal of the Estate's Amended Complaint based on Ohio and Pennsylvania's survival action laws, our Court of Appeals remands for a choice of law analysis.

Wells Fargo moved to dismiss the Amended Complaint arguing, among other things, Liane McDonald did not state a claim under Pennsylvania law because Ohio law applies under the Contract and the Estate's breach of contract "claim fails because this cause of action had not accrued prior to the death of Patricia McDonald."[43]  We held the Estate could not state a claim under the Pennsylvania or Ohio survival action statutes because the claims accrued almost three years after her death.[44]

The Estate appealed. Our Court of Appeals held Liane McDonald could not bring claims under the Pennsylvania survival action statute (42 Pa.C.S. § 8302) but found she could bring her claims under another Pennsylvania statute (20 Pa.C.S. § 3311(a)).[45] Our Court of Appeals held Liane McDonald could not bring claims on behalf of the Estate under Ohio law.[46] Our Court of Appeals affirmed our dismissal of Liane McDonald's breach of contract claim "because McDonald concedes that her breach of contract claim must be evaluated under Ohio law" but remanded for a choice of law analysis as to the other claims remaining in the case.[47]

Following issuance of our Court of Appeals' mandate, we set a schedule for trial of either the individual or class claims. We denied Wells Fargo's renewed motion to dismiss.[48] We allowed discovery on the Estate's claim as well as its hope to certify a class.[49] The parties each moved for summary judgment in their favor on the Estate's claims. The Estate moved for class certification.

### D.  Eight Pennsylvanians seek to intervene to bring different class claims.

While we reviewed the summary judgment and class certification motions, eight Pennsylvanians moved to intervene "to protect their rights and the rights of the putative class."[50] The intervenors—Joseph Yerty, Tammy Yerty, James Zaronsky, Linda Zaronsky, Vincent Sorace, Paul Besnecker, Ashley Yates, and Viktor Stevenson—are Pennsylvania residents who purchased vehicles, and had them repossessed, in Pennsylvania.[51] While their individual claims are tolled pending a final decision on class certification, they seek to nevertheless intervene to preserve their claims through their chosen counsel. They argue the Estate's counsel and the Estate are not adequate to serve in fiduciary roles and issues of typicality, commonality, and choice of law "weaken" the likelihood of certification. They also challenge Wells Fargo's Notices for failing to disclose the ability to reinstate the loan or ability to access personal possessions in their cars before sale. But they also challenge Wells Fargo charging third-party fees and selling the cars at a public

auction when the Notice described selling the cars at a private sale. They ask us to allow them to intervene and then sever their claims so they can take advantage of the tolling provided by class actions and begin a new case.

## II.    Analysis

The parties now cross-move for summary judgment on the Estate's Article 9 and conversion claims.[52] The Estate also moves for class certification, which Wells Fargo opposes on numerous grounds. The eight putative members of the Class move to intervene arguing the Estate is not properly representing the Class and they would like to take over the case as a class action with new theories or sever their new claims into a successive class action tolled by the Estate's filing of this case.

We find the Estate fails to show Wells Fargo's Notices violated sections 9614 or 9616, but a jury must determine whether Wells Fargo's failure to recant the minimum bid price in the January 4, 2013 Notice and non-compliance with the MVSFA rendered the sale unreasonable under section 9610. A jury must also determine whether Wells Fargo had consent to repossess and dispose of the GMC Sierra, a necessary element of the Estate's conversion claim we cannot resolve absent credibility findings. The Estate has not shown the typicality, predominance, and superiority elements needed for class certification. As we cannot certify this class as a matter of law, the intervenors have not shown a basis to intervene with a separate class to the extent they raise the same claims and we will not exercise discretion to add new liability theories which may not apply to the Estate. The Intervenors may attempt to pursue their individual timely claims. But we will proceed to trial on the Estate's claims under section 9610 and conversion alone.

**A. Disputed facts require a trial on the Estate's claims under section 9610 and for conversion but the Estate fails to show Wells Fargo violated sections 9614 and 9616 as a matter of law.**

The Estate challenges Wells Fargo's November 30, 2012 and January 4, 2013 pre-sale Notices. The Estate argues summary judgment in its favor is appropriate because violations of Article 9 of the Pennsylvania Commercial Code and the incorporated MVSFA are apparent on the face of the Notices. These statutory violations, the Estate argues, stripped Wells Fargo of a lawful justification to dispose of the GMC Sierra. Wells Fargo argues the Estate cannot bring the statutory claims because they are governed by Ohio law, and the claims fail on the merits. Wells Fargo argues the Estate's conversion claim is barred by the statute of limitations or the gist of the action doctrine and fails on the merits because the parties' Contract provided the consent and lawful justification to repossess and sell the GMC Sierra at auction.

**1. We apply Pennsylvania law to the Article 9 claims.**

The parties again dispute whether Pennsylvania or Ohio law governs the Estate's Commercial Code claims. As a federal court sitting in diversity, "we apply the choice-of-law-rules of the forum state, Pennsylvania."[53] Wells Fargo argues Ohio law applies based on the Contract, even though we are today reviewing a Pennsylvania citizen's claim against a South Dakota citizen relating to conduct entirely in Pennsylvania. The Estate argues Pennsylvania law applies. We must apply Pennsylvania law because the parties' choice of law provision does not encompass the Article 9 claims and Pennsylvania maintains the greatest interest in applying its consumer protections to resident debtors.

**a. The Contract's chosen Ohio law does not govern the Article 9 claims.**

Pennsylvania courts generally honor and enforce contractual choice of law provisions, so our analysis must begin with the language of the parties' Contract. It provides "[f]ederal law and

the law of the state of our address shown on the front of this contract apply to this contract."[54] Choice of law provisions are creatures of contract. The parties retain wide latitude to draft choice of law provisions as broadly, or as narrowly, as they wish.[55] To effectuate the parties' agreement, we must therefore assess whether the parties manifested an intent to subject all or merely certain claims to Ohio law. If the choice of law provision is "[n]arrow"—i.e., if the provision "stat[es] that a contract's terms or enforcement are to be governed, or construed, by the laws of another state"—Pennsylvania courts construe such a provision "to relate only to the construction and interpretation of the contract at issue."[56] If, by contrast, "the fair import of the provision embraces all aspects of the legal relationship," Pennsylvania courts interpret the choice of law provision to broadly encompass non-contractual claims as well.[57] Applying these standards, we find, as we did in our September 19, 2018 Memorandum, the parties' choice of law provision is narrow, encompassing only claims relating to the interpretation of the contract. Such an interpretation flows from the parties' chosen language. They agreed Ohio law would "apply to *this contract*,"[58] not "all aspects of the[ir] legal relationship."[59] Consistent with this logic, Wells Fargo reasonably acknowledges Pennsylvania law governs the Estate's conversion claim, and the Estate reasonably concedes Ohio law governs its breach of contract claim. But the parties clash about the Commercial Code claims, a much closer question.

Wells Fargo argues even a narrow interpretation of the Contract's choice of law provision encompasses the Article 9 claims, which are more like contract claims than freestanding statutory or common law tort claims. Wells Fargo argues "the UCC requirements effectuate the rights and obligations created by the Contract," distinguishing them from other freestanding statutory causes of action.[60] The Estate frames the Article 9 claims differently. It argues the statutory provisions— protections relating to the reasonableness of, and the notice accompanying, disposition of collateral

following default—operate not merely as default contractual provisions but as "consumer borrowers' protections" which "cannot be waived or modified by agreement."[61]

Wells Fargo's argument has some logical appeal, as the Pennsylvania Commercial Code may generally supply default contract terms and supplant common law causes of action. In the context of Article 2, for example, the Commercial Code "only applies to *contracts* for the sale of goods."[62] Here, however, the text and purpose of the Pennsylvania Commercial Code provide compelling support for the Estate's characterization of the relevant provisions as freestanding consumer protections untethered to our interpretation of the Contract. The Pennsylvania General Assembly found the Article 9 rights so important debtors or obligors "may not waive or vary the rules."[63] The Official Comment explains, "in the context of rights and duties after default, our legal system traditionally has looked with suspicion on agreements that limit the debtor's rights and free the secured party of its duties."[64] It further cautions "[t]he context of default offers great opportunity for overreaching."[65]

Prohibiting modification or waiver of such rules prevents such overreaching where the balance of power is so often tilted in favor of the secured creditor. Other provisions of the Commercial Code involving willing buyers and sellers may not have such protective effect. But in the context of Article 9, such provisions appear to operate wholly independent of the parties' contractual obligations; they are more like a consumer protection statute than a traditional contract claim. We find the Contract's choice of law provision does not govern the Estate's Article 9 claims.

### b. Pennsylvania maintains a greater interest in applying its consumer protections to this dispute.

But then what law should apply to the Article 9 claims? "When a choice of law provision in a contract does not apply to particular claims, as is the case here, the claims not covered by the

provision must be analyzed under the factors set forth by the United States Court of Appeals for the Third Circuit in *Hammersmith v. TIG Insur. Co.,* 480 F.3d 220 (3d Cir.2007)."[66] "In Pennsylvania, 'the first part of the choice of law inquiry is best understood as determining if there is an *actual* or real conflict between the potentially applicable laws.'"[67] The parties do not offer a side-by-side comparison of the relevant Ohio and Pennsylvania commercial code, but one is not needed here; notwithstanding any overlap or difference in the commercial code provisions between the neighboring states, there is an actual conflict between Ohio and Pennsylvania law because, as our Court of Appeals held, Liane McDonald (on behalf of the Estate) "cannot bring her claims as survival actions under Ohio law, and unlike Pennsylvania law, Ohio law does not have any other statutes under which McDonald can maintain her claims."[68]

We must then "classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation."[69] "A 'false conflict' exists when only one state's interests would be impaired by the application of the other state's law."[70] "An 'unprovided-for' case is one in which *neither* state's interests would be impaired if its laws were not applied."[71] And a "true conflict" exists, our Court of Appeals instructs, "if *both* jurisdictions' interests would be impaired by the application of the other's laws."[72] This case appears to present a true conflict. Pennsylvania's interest in protecting resident debtors from the "overreaching"[73] or otherwise unscrupulous conduct of secured creditors would be substantially impaired by the application of Ohio law, which contains no "statutes under which McDonald can maintain her claims."[74] Ohio arguably has some interest in applying its law to this dispute. As we found in our September 19, 2018 Memorandum, Ohio does not permit Liane McDonald to vindicate these claims through a survival action (or any other statutory provision), reflecting a policy of protecting businesses from any such claims.[75] As we describe further below, however, we question the extent of Ohio's interest in this dispute between a South Dakota citizen

13

(Wells Fargo)[76] and a Pennsylvania citizen (Liane McDonald) over a car located at all relevant times in Pennsylvania.

A true conflict necessitates "[a] 'deeper [choice of law] analysis'"[77] to "determine which state has the 'greater interest in the application of its law.'"[78] We must do "more than a 'mere counting of contacts.'"[79] "[W]e must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue."[80] This qualitative analysis compels application of Pennsylvania law, because the Commonwealth has a paramount interest in applying its consumer protection provisions to protect resident debtors. In *In re Actiq Sales & Marketing Practices Litigation*, Judge Tucker "agree[d] with the outcome of several Pennsylvania cases where, in the context of class action suits involving state consumer protection laws, the courts have determined that 'under Pennsylvania choice of law principles, each class member would be subject to the consumer fraud statutes of the member's home state because that state would have the paramount interest in applying its laws to protect its consumers.'"[81] This analysis applies with equal force to the Estate seeking the protection of Article 9 and the MVSFA.

Although we construe the Estate's Article 9 claims as standalone consumer protection claims, we would reach the same result assessing "the contacts listed in § 188(2) of the *Restatement (Second) of Conflict of Laws* to determine which state has greater contacts with the contract at issue,"[82] which the parties apply in their briefing.[83] Section 188(2) "directs us to take the following contacts into account: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties."[84] We held in our September 19, 2018 Memorandum the limited facts in the amended

complaint required we apply Pennsylvania law. The extensive fact record before us compels the same conclusion, and Wells Fargo is not entitled to summary judgment on choice of law grounds.[85]

The first factor, the place of contracting, points to Pennsylvania. As we found on September 19, 2018, this factor weighs in favor of Ohio because the Estate did not allege where the parties signed the contract, but we "dr[e]w the reasonable inference they signed at the Ohio dealership."[86] Discovery confirmed our inference is wrong. Rick McDonald swore, and Wells Fargo has no evidence to the contrary, the parties executed the contract in Pennsylvania. Representatives of Performance GMC delivered the vehicle to the Pennsylvania ice rink at which Rick McDonald worked, and Patricia McDonald signed the necessary documents in Pennsylvania.[87]

The second factor, the place of negotiation, is indeterminate. Rick McDonald swore he negotiated the contract with the Ohio dealership over the phone; he conducted the negotiations from Pennsylvania and never set foot in Ohio. There is no evidence the parties concluded negotiations in person at the Pennsylvania ice rink. This factor therefore does not point conclusively to Pennsylvania or Ohio.

The third factor, the place of performance, points more towards Pennsylvania than Ohio. Rick McDonald swore he used the GMC Sierra for work in Pennsylvania. There is no evidence he drove the vehicle in Ohio. It is not apparent what, if any, performance touched Ohio. Under the Contract, Performance GMC assigned its rights to Wells Fargo, which, in turn, instructed Patricia McDonald to send payments to California.

The fourth factor, the location of the subject matter of the contract, points to Pennsylvania. It is not disputed Rick McDonald used the vehicle in Pennsylvania at all relevant times until its repossession in Pennsylvania.

The fifth factor—the domicile, residence, nationality, place of incorporation and place of business of the parties—points to Pennsylvania. As in September 2018, we still know little about Performance GMC, other than it conducted business in Ohio and assigned its rights under the contract to Wells Fargo. Wells Fargo, however, is a South Dakota citizen which directed Patricia McDonald to send payments to California. Ohio's interest is outweighed by Pennsylvania's interest on this factor, as the McDonalds remained in Pennsylvania at all relevant times.

We apply Pennsylvania law to the Article 9 claims.

### 2. Wells Fargo's November 30, 2012 and January 4, 2013 pre-sale Notices satisfy section 9614.

The Estate argues Wells Fargo's November 30, 2012 Notice and January 4, 2013 Notice of Continued Sale lacked information required by section 9614 of the Pennsylvania Commercial Code, governing the "[c]ontents and form" of pre-disposition notification in consumer-goods transactions.[88] Upon careful examination, we find the Notices satisfy Section 9614.

Section 9614(1) "sets forth the information required for a reasonable notification in a consumer-goods transaction."[89] Section 9614(1)(i) contains no requirements of its own; it incorporates the notice requirements in 13 Pa.C.S.A. § 9613(1).[90] Section 9613(1) provides "[t]he contents of a notification of disposition are sufficient if the notification:

(i)     describes the debtor and the secured party;
(ii)    describes the collateral which is the subject of the intended disposition;
(iii)   states the method of intended disposition;
(iv)    states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and
(v)     states the time and place of a public disposition or the time after which any other disposition is to be made."[91]

Wells Fargo's November 30, 2012 Notice contains this information. It describes the debtor ("Patricia A. McDonald"), the secured party ("Wells Fargo Bank, N.A. DBA Wells Fargo Dealer Services"), and the collateral to be sold ("2002 GMC Sierra 1GTHK29182E291423").[92] It also

states the method of intended disposition ("public sale"), as well as the date ("01/03/13"), time ("1:00 PM"), and location ("Manheim Ohio 3905 Jackson Pike Grove City OH 43123") of the public sale.[93]

Wells Fargo also complied with Section 9613(1)(iv)'s requirement the notice "state[] that the debtor is entitled to an accounting of the unpaid indebtedness and state[] the charge, if any, for an accounting."[94] The first page of the November 30, 2012 Notice provides "[i]f you want us to *explain to you in writing how we have figured the amount that you owe us*, you may call us at 888-937-9992 (or write us at REINSTATEMENTS E2578-021, Wells Fargo Dealer Services, P.O. Box 3599, Rancho Cucamonga, CA 91729) and *request a written explanation*."[95] The Estate does not identify how Wells Fargo's offer to "explain to you in writing how we have figured the amount that you owe us" refers to anything other than section 9613(1)(iv)'s requirement to offer an "accounting of the unpaid indebtedness." The Notice states in plain understandable language Wells Fargo will provide an accounting if the debtor requests it. And the statute itself, which emphasizes substance over form, permits Wells Fargo to speak in language its customers can understand.[96]

The Estate argues Wells Fargo's accounting reference is deficient in any event because Wells Fargo does not "state[] *the charge*, if any, for an accounting."[97] The Estate, however, does not identify what accounting it could have requested (or what Wells Fargo would have charged for), given Wells Fargo provided on the second page of the November 30, 2012 Notice a summary of the overdue charges:

<u>12/20/12</u> Is the Last Date for Payment
(15 days from the date this Notice is mailed or 20 days from the date of the repossession whichever is later)

Payment is due for the months of <u>08/06/12</u>, <u>THROUGH</u>, <u>11/06/12</u>

| | | | |
|---|---|---|---|
| Total amount of overdue payments | | $ | 2255.74 |
| Accrued Delinquency and Deferral | | $ | 582.01 |
| Total Repossession Charges Assessed (est) | | $ | |
| Required Minimum Repossession Payment (est) | | $ | 25.00 |
| Performance Deposit | 2 X 0.00 | $ | 0.00 |
| Total Amount Due | | $ | 2862.75 |

The Estate does not adduce evidence Wells Fargo charged Patricia McDonald or any other debtors for a first requested accounting. And the statute—which requires the lender "state[] the charge, *if any*, for an accounting"[98]—does not compel the lender to state a zero-dollar accounting fee. If it did, the statute's actual phrasing would make little sense, as the Pennsylvania General Assembly could have simply required the lender "state the charge for an accounting." It did not. We decline to adopt a construction rendering the words "if any" mere surplusage.

The Estate's additional arguments do not show Wells Fargo violated section 9614(1)'s remaining requirements. Section 9614(1)(ii) requires the Notice describe "any liability for a deficiency of the person to which the notification is sent."[99] The Notice describes the liability, informing Patricia McDonald "[w]e have your [vehicle] *because you broke promises in our agreement*,"[100] and "[a]s a result of your default under the terms of your Contract/Security Agreement . . . we obtained possession of the motor vehicle."[101] Section 9614(1)(iii) requires the notice provide "a telephone number from which the amount which must be paid to the secured party to redeem the collateral . . . is available." [102] Wells Fargo provides this information on the Notice's first page: "[y]ou can get the property back at any time before we sell it by paying us the full amount you owe (not just the past due payments), including our expenses. To learn the exact amount you must pay, call us at <u>888-937-9992</u>."[103]

Section 9614(1)(iv) requires the Notice provide "a telephone number or mailing address from which additional information concerning the disposition and the obligation secured is

available."[104]  The Notice provides this, too, in clear terms: "[i]f you need more information about the sale, call us at <u>888-937-9992</u> or write us at <u>REINSTATEMENTS E2578-021, Wells Fargo Dealer Services, P.O. Box 3599, Rancho Cucamonga, CA 91729</u>."[105]  The Notice provides the same telephone number three times on the first page, negating any claim a consumer would not know what number to call with a question, concern, or request for more information.

Nor does the January 4, 2013 Notice informing the debtor of the continued sale date run afoul of section 9614's requirements.  The November 30, 2012 Notice contains a variety of lengthy disclosures, Wells Fargo's contract information, and a complimentary accounting, as we describe above.  The January 4, 2013 Notice merely informs Patricia McDonald of the rescheduled public sale date, time, and location.

### 3. A jury must resolve the material questions of fact surrounding the reasonableness of the November 30, 2012 and January 4, 2013 pre-sale Notices under section 9610.

Separate from its claim Wells Fargo's Notices failed to comply with section 9614's detailed requirements, the Estate argues deficiencies in Well Fargo's pre-sale November 30, 2012 and January 4, 2013 Notices rendered the sale commercially unreasonable under section 9610.  This statute broadly requires reasonable notice and a commercially reasonable disposition of collateral.  Section 9610 mandates *"[e]very aspect* of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable."[106]

While not specifically suing under section 9611, the Estate invokes Wells Fargo's obligations under section 9611, which mandates "a secured party that disposes of collateral under § 9610 (relating to disposition after default) shall send . . . a reasonable authenticated notification of disposition."[107] Section 9610 focuses on commercially reasonable dispositions and section 9611

focuses on the reasonable notice. Reasonableness under sections 9610 and 9611 is a fact-intensive inquiry.

> ### a. A jury must decide whether Wells Fargo's failure to recant its minimum bid price in the January 4, 2013 Notice rendered the sale unreasonable.

The Estate argues Wells Fargo's January 4, 2013 Notice of Continued Sale, which failed to affirmatively recant or address the minimum price term contained in the November 30, 2012 Notice, rendered the sale commercially unreasonable. Wells Fargo counters it "attempted to sell the vehicle on January 3, 2013, but it was unable to do so," a reasonable basis for omitting any such minimum bid term in the January 4, 2013 Notice.[108] Wells Fargo argues it conducted a commercially reasonable sale. A jury, not this Court, must determine the commercial reasonableness of the January 22, 2013 sale.

Article 9 emphasizes a secured creditor may send a revised notice of sale, but the revised notice, like all notice, must be reasonable. In its Comment to section 9611, the General Assembly directs "[n]othing in this Article . . . prevent[s] a secured party from electing to send a revised notification if its plans for disposition change."[109] But it emphasizes: "*[t]his assumes, however, that the secured party acts in good faith, the revised notification is reasonable, and the revised plan for disposition and any attendant delay are commercially reasonable.*"[110]

Wells Fargo's lengthy November 30, 2012 Notice advised Patricia McDonald, "[w]e will sell [your vehicle] at public sale at a minimum bid of 9,157.00."[111] Wells Fargo's January 4, 2013 Notice of Continued Sale disclosed an unsuccessful attempt "to sell your [vehicle] on 01/03/13, at MANHEIM OHIO Auto Auction" and informed Patricia McDonald "we have scheduled another public sale" to take place on January 22, 2013 at noon at the same auction facility.[112] But context

matters in a reasonableness inquiry. Unlike the lengthy November 30, 2012 Notice, the January 4, 2013 Notice is substantially shorter than the first.

Compared with the lengthy disclosures in the November 30, 2012 Notice, the brief January 4, 2013 Notice could leave a reasonable recipient with the impression Wells Fargo changed only the date and time of the auction since the November 30, 2012 Notice. Given Wells Fargo's failure to recant or address the minimum bid provision in the second Notice, it would not be *per se* unreasonable for a recipient to perceive the minimum bid provision as still operative. A jury could find commercial reasonableness required Wells Fargo affirmatively address *all* information or terms no longer accurate or in effect when it sent the January 4, 2013 Notice. We deny the parties' motions for summary judgment on this issue.

### b. A jury must also decide whether Wells Fargo's failure to provide the Notices required by the MVSFA rendered the repossession and sale commercially unreasonable under section 9610.

The Estate argues Wells Fargo's failure to comply with the then-operative MVSFA rendered the sale commercially unreasonable under section 9610. The Estate argues Wells Fargo's November 30, 2012 and January 4, 2013 pre-disposition Notices failed to "set forth the buyer's right as to reinstatement,"[113] "disclose the place at which the motor vehicle is stored,"[114] or to inform the buyer "any personal property left in the repossessed vehicle will be held for thirty (30) days from the date of the notice's mailing,"[115] despite section 623(D) of the MVSFA mandating such disclosures. The Estate does not allege a freestanding claim under the MVSFA. It instead argues these defects prove Wells Fargo failed to comply with section 9610, which requires "[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable."[116]

Although the Pennsylvania General Assembly repealed the MVSFA effective December 1, 2014, we apply the version in effect during Wells Fargo's repossession and sale of the GMC Sierra in 2012–13.[117]  The MVSFA in effect in 2012–13 permits repossession by self-help or legal process.  The MVSFA ensures debtors subject to self-help repossessions receive adequate notice and an opportunity to protect available interests in the property.  The MVSFA, for example, prohibits a secured creditor from effecting a self-help repossession in "breach of the peace" or in "violation of the criminal law."[118]  The MVSFA also restricts the persons or entities which may conduct self-help repossessions.[119]  But there is no private right of action in the MVSFA.  So the Estate must argue through section 9610.

The Estate invokes section 623(D) of the MVSFA, which requires the secured creditor in a self-help repossession provide the debtor, among other things, notice, disclosure of an opportunity to reinstate the contract (if available under the contract), information describing the location where the vehicle is stored, and notice of an opportunity to obtain personal belongings in the vehicle:

> When repossession of a motor vehicle, which is the subject of an installment sale contract, is effected otherwise than by legal process, the holder shall immediately furnish the buyer with a written "notice of repossession" delivered in person, or sent by registered or certified mail directed to the last known address of the buyer.  Such notice shall set forth the buyer's right as to reinstatement of the contract, if the holder extends the privilege of reinstatement and redemption of the motor vehicle, shall contain an itemized statement of the total amount required to redeem the motor vehicle by reinstatement or payment of the contract in full, shall give notice to the buyer of the holder's intent to re-sell the motor vehicle at the expiration of fifteen (15) days from the date of mailing such notice, shall disclose the place at which the motor vehicle is stored, and shall designate the name and address of the person to whom the buyer shall make payment, or upon whom he may serve notice.  The holder's notice shall also state that any personal property left in the repossessed vehicle will be held for thirty (30) days from the date of the notice's mailing.  The personal property may be reclaimed within the thirty (30) day time period. Thereafter the property may be disposed of in the same manner as the motor vehicle and other collateral.[120]

The Estate argues Wells Fargo's November 30, 2012 and January 4, 2013 pre-sale Notices violated three specific protections in section 623(D) by failing to "set forth the buyer's right as to reinstatement"; "disclose the place at which the motor vehicle is stored"; and, inform the debtor "any personal property left in the repossessed vehicle will be held for thirty (30) days from the date of the notice's mailing."[121]  Wells Fargo defends its omissions by arguing the MVSFA "is a regulatory enforcement statute that does not authorize or creat[e] any civil cause of action,"  "any purported notice obligation would run only to the 'buyer' of the motor vehicle, Patricia," "there is no allegation (or evidence) that any of [Patricia McDonald's] personal property was in the Sierra when it was repossessed," and there was no right to reinstate the contract.[122]

We need not resolve Wells Fargo's argument the MVSFA contains no private cause of action.[123]  The Estate does not allege a standalone claim under the MVSFA.  It instead argues Wells Fargo's failure to comply with the MVSFA section 623(D)'s requirements governing the repossession of motor vehicles violated section 9610's requirement "every aspect of the disposition of collateral must be commercially reasonable."[124]

Courts applying Pennsylvania law endorse the Estate's theory of liability.  In *Nawrocki v. Faulkner Ciocca Ford of Souderton*, Judge Dalzell explained "[m]ost of the provisions of the [Finance Act] that an individual buyer can enforce supply elements of another cause of action."[125]  And in *Cosgrove v. Citizens Automobile Finance, Inc.*, Judge Schiller approved a class action settlement in which plaintiffs sought damages under Article 9 for failure to provide reasonable notice based on violations of Section 623(D) of the MVSFA. "The Pennsylvania Uniform Commercial Code," Judge Schiller explained, "does not define 'reasonable' notice, but Pennsylvania courts define the term by looking to statutes governing vehicle finance and repossession," including section 623(D) of the MVSFA.[126]

After careful review of Wells Fargo's November 30, 2012 and January 4, 2013 Notices, the Estate adduced evidence of a MVSFA violation to proceed to a jury, but we cannot resolve the question of liability as a matter of law. It cannot reasonably be disputed Wells Fargo's Notices do not describe the place at which it stored the GMC Sierra before the auction or the right to obtain personal property left in the repossessed GMC Sierra. And although the November 30, 2012 Notice informed Patricia McDonald she could "reinstate this default until" December 20, 2012 by paying the $2,862.75 due on the account, Wells Fargo argues "all Patricia's payments were past due and there were no future payments under the installment contract to be made," so "there was nothing to reinstate."[127] This fact, if true, could render the reinstatement language in the November 30, 2012 Notice incorrect or misleading under the circumstances.

To the extent Wells Fargo argues the Estate failed to demonstrate Patricia McDonald had any property in the vehicle at time of repossession, Wells Fargo is free to argue this evidence to a jury as evidence of commercial reasonableness under the circumstances and/or a lack of actual damages. For although we find the Estate has sufficiently alleged an injury for purposes of Article III standing, "Pennsylvania law makes clear that the question of whether [the plaintiff] suffered a compensable injury and, if so, the extent of that injury, is for a jury to decide."[128] Wells Fargo's defense relating to the identity of the debtor is also a fact question suited for trial, as we discuss below.

### c. We cannot resolve as a matter of law Wells Fargo's fact-intensive defense under section 9628.

Wells Fargo argues it cannot be held liable under Article 9 because there existed no debtor at the time it repossessed and sold the GMC Sierra, and, even if there were a debtor, it did not know the debtor's identity or how to communicate with the debtor. Wells Fargo first argues section 9625 limits recovery to "a person that was a debtor or a secondary obligor at the time a

secured party failed to comply with this chapter."[129] Wells Fargo argues "only [Patricia McDonald] had an interest in the collateral," but "[b]ecause Patricia had died and no estate was established at the time Wells Fargo allegedly failed to comply with the UCC's notice requirements, no borrower/debtor existed who can recover damages."[130] The Estate counters Patricia McDonald's husband Richard McDonald "became both the debtor and the obligor under the [Contract] and he occupied that dual role when Wells Fargo sent its defective notices" because "[i]t is a venerable principal of Pennsylvania law that when an individual passes away, the beneficial interest in his/her personalty immediately vests in his/her heirs."[131]

The Estate reaches this conclusion citing Pennsylvania cases discussing intestate succession, despite numerous witnesses swearing Patricia McDonald had a Will. Patricia McDonald's Will, however, is not in the record. We also question Wells Fargo's aggressive reading of Article 9, which would appear to leave secured creditors free to commit any number of repossession violations with impunity so long as they do so before grieving family members open an Estate. We lack a basis to find the Pennsylvania General Assembly drafted Article 9 to permit such conduct. And we further doubt Wells Fargo would be so generous in its statutory interpretation were it attempting to collect a debt from Patricia McDonald.

But we need not explore the perimeters of Pennsylvania estate law to conclude, as we believe our Court of Appeals did, at least one debtor existed at the time Wells Fargo repossessed and sold the GMC Sierra. Pennsylvania statute provides "[n]othing in this title shall be construed as impairing any lien or charge on real or personal estate of the decedent which existed at his death."[132] As Judge Young described the obligation, "[t]he laws as written treat all alike, and mandate that each person shall pay his or her legal debts *before* permitting any distribution to beneficiaries."[133]

Wells Fargo also invokes section 9628 providing "[a] secured party is not liable because of its status as secured party to . . . [a] person that is a debtor or obligor unless the secured party knows: (i) that the person is a debtor or obligor; (ii) the identity of the person; and (iii) how to communicate with the person."[134]  Wells Fargo argues even if Rick McDonald (Patricia's son) or Richard McDonald (Patricia's husband) became the debtor by operation of estate law, Wells Fargo "did not know *at the time* that [Rick McDonald or Richard McDonald] were debtors, their identities, or how to communicate with them."[135]

As we found in our September 19, 2018 Memorandum, "[d]etermining Wells Fargo's knowledge—or lack thereof—of the debtor's identity would require resolving a factual dispute, which we cannot do at this stage of the litigation."[136]  The same reasoning applies today.  Summary judgment is not a vehicle to probe Wells Fargo's knowledge, particularly given the issues surrounding Rick McDonald's numerous alleged misrepresentations to Wells Fargo representatives and whether a public database search did (or could) put Wells Fargo on notice of Patricia McDonald's death.  A jury must assess and resolve the parties' differing accounts of Wells Fargo's knowledge.

### 4. We grant summary judgment to Wells Fargo on the Estate's section 9616 claims challenging the January 27, 2013 deficiency Notice.

The Estate moves for summary judgment on its claims seeking actual damages for Wells Fargo's alleged failure to explain "its calculation of any surplus or deficiency" and "failed to include in its notice . . . 'a telephone number or mailing address from which additional information concerning the transaction is available.'"[137]  We identify no such omissions.

Wells Fargo's January 27, 2013 deficiency Notice is governed by section 9616, which requires the secured party "[s]end an explanation to the debtor or consumer obligor"[138] providing:

(1) The aggregate amount of obligations secured by the security interest under which the disposition was made and, if the amount reflects a rebate of unearned interest or credit service charge, an indication of that fact, calculated as of a specified date . . .
(2) The amount of proceeds of the disposition.
(3) The aggregate amount of the obligations after deducting the amount of proceeds.
(4) The amount, in the aggregate or by type, and types of expenses, including expenses of retaking, holding, preparing for disposition, processing and disposing of the collateral and attorney fees secured by the collateral which are known to the secured party and relate to the current disposition.
(5) The amount, in the aggregate or by type and types of credits, including rebates of interest or credit service charges, to which the obligor is known to be entitled and which are not reflected in the amount in paragraph (1).
(6) The amount of the surplus or deficiency.[139]

The deficiency notice Wells Fargo sent Patricia McDonald contains a detailed accounting which tracks section 9616's requirements:

| | |
|---|---|
| A. Aggregate amount of obligations secured as of November 28, 2012, the date of repossession (Includes current principal balance due and finance charges accrued as of the date of repossession, and reflects certain credits due under state law*) | $2,238.10 |
| B. Accrued finance charges, late fees and charges not included in "A," as of the date of this letter | $634.79 |
| C. Less rebate of unearned finance charges or credit service charge, if any | $0.00 |
| D. Subtotal ("A" plus "B" minus "C") | $2,872.89 |
| E. Gross Proceeds from disposition or sale | $3,400.00 |
| F. Balance remaining after applying sale proceeds ("D" minus "E") | ($527.11) |
| G. Costs of repossession | $350.00 |
| H. Storage expenses | $0.00 |
| I. Costs of preparation and sale | $470.00 |
| J. Attorney's Fees/Legal Expenses, as permitted by law | $0.00 |
| K. Subtotal of Costs of Repossession and Sale ("G" plus "H" plus "I" plus "J") | $820.00 |
| L. Credits not included in "A," including insurance and other rebates, if any | $0.00 |
| M. Amount of Deficiency or (Surplus) After Sale ("F" Plus "K" minus "L")** | $292.89 |
| **Deficiency Balance You Must Pay** or **(Surplus)** to be Paid to You | $292.89 |

Using language directly from section 9616, Wells Fargo's January 27, 2013 Notice provides an "[a]ggregate amount of obligations secured" ($2,238.10).[140] It further provides the "[g]ross [p]roceeds" from the disposition ("$3,400"), as required by 13 Pa.C.S.A. § 9616(c)(2).[141] The Notice discloses the "[a]ggregate amount of obligations secured," complying with section 9616(c)(3).[142] It also provides the aggregate amount "of expenses, including expenses of retaking, holding, preparing for disposition, processing and disposing of the collateral and attorney fees

secured by the collateral which are known to the secured party and relate to the current disposition,"[143] in a row labeled "Subtotal of Costs of Repossession and Sale."[144]  In a separate row labeled "[c]redits not included in 'A,' including insurance and other rebates, if any," the Notice complies with section 9616(c)(5)'s requirement to provide the debtor such information.[145]  And in bolded font, the January 27, 2013 Notice informs the reader the total amount of deficiency is $292.89, as required by section 9616(c)(6).  Wells Fargo's detailed breakdown complies in both form and substance with the section 9616 requirements governing explanations.

The Estate also argues Wells Fargo's January 27, 2013 Notice failed to include "a telephone number or mailing address from which additional information concerning the transaction is available."[146]  The Estate acknowledges the deficiency Notice identifies a telephone number but argues "Wells Fargo did not even hint that the phone number in its [Deficiency] Notice existed for any purpose other than to make a payment upon the deficiency that had resulted from its commercially unreasonable sale of the Vehicle."[147]

The Estate's characterization ignores the context of the Notice, in which Wells Fargo twice lists the same phone number: first, to arrange payments, and second, to raise inquiries.  The Estate relies on Wells Fargo's first reference to its phone number, which states: "If this letter indicates that you owe a deficiency, please contact our office at 1-800-752-8533 Monday through Friday . . . to make satisfactory arrangements to pay the Deficiency Balance You Must Pay."[148]  Payments only, the Estate argues.  But this argument has force only if the reader declines to look just slightly further down the page, to a section labeled, in bolded font, "Any notice *or inquiry* should be directed to."[149]  The section provides the same phone number (1-800-752-8533), as well as a mailing address.

The January 27, 2013 Notice complies with section 9616's mandate to provide "a telephone number or mailing address from which additional information concerning the transaction is available."[150]

### 5. We deny the cross-motions on the Estate's conversion claim.

The parties cross-move for summary judgment on the Estate's conversion claim. The Estate argues Wells Fargo's failure to adhere to the MVSFA and Article 9 deprived it of legal justification to "dispose of the [GMC Sierra],"[151] effecting a conversion. Wells Fargo argues the Estate's conversion claim is barred by the statute of limitations as well as the gist of the action doctrine; on the merits, Wells Fargo argues the parties' Contract expressly provides Wells Fargo the right to repossess in the event of default, and "where consent and lawful justification exist at the time of the conversion, a purportedly deficient [Article 9] notice does not retroactively remove that consent and justification."[152]

Wells Fargo first argues we cannot proceed to the merits of the conversion claim because it is barred by Pennsylvania's two-year statute of limitations. Wells Fargo argues it repossessed the GMC Sierra on November 28, 2012, sold it on January 22, 2013, and the Estate, for no apparent reason, waited three years (until January 25, 2016) to file this case. The Estate counters our Court of Appeals foreclosed this argument because it explained "[t]he Pennsylvania Supreme Court has further clarified that statutes of limitations run 'from the grant of administration.'"[153] We again find the Estate's conversion claim is not time barred.

In our Court of Appeals, Wells Fargo argued delay in opening the Estate cannot excuse the untimely conversion claim because "the cause of action accrue[d] upon the taking of the property"; "the Amended Complaint pleads no excuse or explanation why no administrator was appointed for over six years after [Patricia] McDonald's death and three years after the Sierra was

repossessed"; and "[t]he Estate should not benefit from the concealment of McDonald's death, and the unexplained years-long delay in obtaining the authorization necessary to administer the estate."[154] Our Court of Appeals found the argument unavailing. It held "[Liane] McDonald has the power to maintain her causes of action against Wells Fargo should Pennsylvania law be found to apply to them," and "*[t]he fact that McDonald was not appointed as administratrix of Patricia McDonald's estate until years after the sale of the vehicle does not change our conclusion*."[155] Our Court of Appeals added, "[a]s the Pennsylvania Supreme Court has explained, '[a] cause of action does not exist unless there be a person in existence capable of suing or of being sued,'" and "[t]he Pennsylvania Supreme Court has further clarified that statutes of limitations run 'from the grant administration.'" [156]

Attempting to overcome our reluctance to relitigate an issue our Court of Appeals already addressed, Wells Fargo now argues we should find the conversion claim time-barred because our Court of Appeals relied on outdated authority. Wells Fargo argues *Riner v. Riner*, which our Court of Appeals quoted for the proposition "statutes of limitations run 'from the grant administration,'"[157] "predated the Probate Code and specifically tasked the legislature with correcting its decision."[158] Wells Fargo argues 20 Pa.C.S.A. § 3376 "did exactly that."[159] The provision states:

> Any statute of limitation which would bar any debt or liability owed the estate of a decedent within one year after the decedent's death shall be extended until the end of one year following the decedent's death. Failure or delay in taking out letters testamentary or of administration shall not affect the operation of any statute of limitations applicable to a debt or liability owed the estate of a decedent.[160]

While Wells Fargo emphasizes the second sentence of section 3376 addressing a delay in taking out letters of administration, the Estate's unliquidated conversion claim does not appear to be either a "debt or liability" triggering section 3376. The Pennsylvania Superior Court's decision

in *Prevish v. Northwest Medical Center* supports this conclusion. The court in *Prevish* held an "unliquidated personal injury tort claim"[161] is not a "debt or liability" triggering section 3376. The court compared section 3376 to section 3383, an analogous provision applying to a "cause of action." The court found the more specific language ("debt or liability") in section 3376 must be given effect because if the General Assembly intended it to cover any "cause of action" as in section 3383, they would "have said so":

> [T]he choice of the phrase "debt or liability" and the omission of the terms "claim" and "cause of action" persuades us that the drafters of amended Section 3376 intended the phrase "debt or liability" to mean something other than "claim" or "cause of action." If the drafters had intended to extend statutes of limitation which would otherwise bar not only any debt or liability owed the estate of a decedent but also any cause of action or unliquidated claim belonging to the estate of a decedent, they could easily have said so. Because they did not, we conclude that Section 3376 does not apply to extend the statute of limitation in this case.[162]

The court in *Prevish* also explained the "general rule" in Pennsylvania "a personal injury tort claim remains unliquidated until it is reduced to a definite amount by a verdict or a settlement."[163] While Wells Fargo argues the Estate's conversion claim "relates to a specific piece of property that has an ascertainable value and the claim is assignable,"[164] the claim itself is not reduced to a definite amount by verdict or settlement. If it were, it would not be at issue today. We apply the rule our Court of Appeals instructed: the clock ran from the grant of administration and the conversion claim is timely.[165]

Wells Fargo argues a timely conversion claim cannot be heard on the merits because it is a breach of contract claim disguised as a tort claim and barred by the gist of the action doctrine. We disagree. To effectuate a policy of forbidding litigants from shoehorning breach of contract claims into putative tort claims, Pennsylvania's gist of the action doctrine "forecloses tort claims: '1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and

4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.'"[166]

The Estate's conversion claim is not barred by the gist of the action doctrine because it is premised on Wells Fargo's failure to comply with requirements found in the MVSFA and Commercial Code— not a breach of the parties' Contract. "Under Pennsylvania law, conversion 'is the deprivation of another's right of property, or use of possession of a chattel, or other interference therewith without the owner's consent and without legal justification.'"[167] In *Nawrocki v. Faulkner Ford of Souderton*, Judge Dalzell found section 623 of the MVSFA "provides plaintiffs with a way to establish an element of the tort of conversion."[168] Because "MVSFA § 623 specifies what constitutes adequate repossession notice," Judge Dalzell explained, "[a] plaintiff could establish [the] lack of lawful justification [element of a conversion claim] by demonstrating that the repossession notice is defective under § 623."[169] The Estate does so here, and so the gist of the action doctrine poses no bar to our consideration of the Estate's conversion claim on the merits.

On the merits, the Estate makes a persuasive showing Wells Fargo lacked lawful justification to dispose of the vehicle. The November 30, 2012 and January 4, 2013 pre-sale Notices do not "disclose the place at which the motor vehicle is stored,"[170] and do not inform the buyer "any personal property left in the repossessed vehicle will be held for thirty (30) days from the date of the notice's mailing."[171] And, as we describe above, a jury could find the Notices do not accurately "set forth the buyer's right as to reinstatement."[172] But the Estate's showing as to the lawful justification element is not enough. The Estate must also demonstrate it did not consent to the repossession and disposition. A material question of fact as to the McDonalds' consent precludes entry of summary judgment for either party on the conversion claim.

In *Scott v. Fred Beans Chevrolet of Limerick, Inc.*, Judge Dalzell granted an automotive dealership's motion for summary judgment on the debtor's conversion claim despite finding a jury must resolve the notice claim. The debtor told the dealership it could pick up the vehicle, and Judge Dalzell found the debtor's consent defeated the conversion claim. Consent in our circumstances must be assessed by a jury. For example, it is not disputed Rick McDonald "was present when the Sierra was repossessed, and he spoke with the repo agent."[173] But we do not know what he said and if he manifested assent. And although we find a jury must determine the consent element, we do not today decide whether the Estate could recover damages for conversion premised solely on MVSFA violations if the jury were to also find Wells Fargo's conduct commercially reasonable under the circumstances. Though this question will affect our jury instructions, we need not resolve it today.

### B.    We deny the Estate's class certification motion.

The Estate also moves for class certification on its remaining claims: (1) actual and statutory damages under section 9610 arising from Wells Fargo's repossession and sale of the GMC Sierra in a commercially unreasonable manner; and, (2) compensatory damages for conversion.

Liane McDonald testified she became administratrix of the Estate to "help the family"[174] and she talks to Rick McDonald "every day."[175] She answered questions regarding her answers to interrogatories.[176] She described being "vaguely" familiar with the Contract's details.[177] The Estate submitted verifications for class counsel Aurelius P. Robleto, Renée A. Kuruce, and Rudy A. Fabian. The Estate first sought to certify a main class of "current or former" Pennsylvania residents who received repossession and disposition notices from Wells Fargo which "incorrectly

stated" the requirements of Pennsylvania statute.[178] Wells Fargo argued the proposed class constituted an unascertainable "fail-safe" class.[179]

Capitulating to Wells Fargo's argument, the Estate proposed a new main class.[180] It now seeks to certify a main class of "[a]ll those who:

a) that [sic] entered into a retail installment sales contract for the purchase of a motor vehicle under which the Defendant became the secured party;

b) who within six years prior to the filing of this action had such vehicle(s) repossessed in Pennsylvania by the Defendant; and

c) to whom the Defendant sent

(1) an "authenticated notification of disposition" within the meaning of 13 Pa.C.S.A. § 9611(b) that exhibited one or more of the following characteristics:

    i. stated a date for the sale of the repossessed vehicle that was different that [sic] the date on which the vehicle was actually sold;

    ii. set forth a minimum bid that was greater than the amount for which the repossessed vehicle was actually sold;

    iii. stated information regarding the method by which the repossessed collateral would be disposed of that differed from the method by which it was actually disposed of;

    iv. did not state that the borrower is entitled to an accounting of the unpaid indebtedness and the charge, if any, for such an accounting;

    v. did not provide information regarding the borrower's right to reinstate;

    vi. did not provide information regarding the borrower's right to redeem; or

    vii. did not state that any personal property left in the repossessed vehicle would be held for 30 days and could be reclaimed during that period; or

(2) an "explanation" within the meaning of 13 Pa.C.S.A. § 9616(b)(1) after the Defendant disposed of their Vehicles that

    i. did not to explain [sic] that additional information concerning the transaction was available and provide a telephone number or

> > > mailing address from which borrowers could access that information; or
>
> > ii. included a notice that a credit may have been applied for the difference between the minimum bid disclosed in the Notice of Our Plan to Sell Property and the amount received for the vehicle at disposition or sale.

Wells Fargo opposes certifying this modified class. It adduced a declaration from John Sonner, a manager of Wells Fargo Auto's specialty collections division.[181] Although Wells Fargo appears to send different repossession forms depending on whether the loan originated in Ohio or Pennsylvania,[182] Mr. Sonner swears Wells Fargo does not maintain data regarding a customer's historical residency.[183] Instead, Wells Fargo can only identify a customer's state of residency at the time it runs a "query" for the customer's documents.[184] Through a query, Wells Fargo can identify the state in which a loan originated.[185] But if a customer's address changes after they initiated the loan, a query will not identify where the customer resided when the loan originated or when Wells Fargo repossessed their vehicle.[186] To identify where a customer lived when Wells Fargo repossessed the customer's vehicle, Wells Fargo "would have to retrieve the imaged copies of the repossession notices sent to the borrower."[187] Patricia McDonald's account received Ohio form notices because her account originated in Ohio.[188]

Mr. Sonner swore Wells Fargo ran a query of borrowers with last-known addresses in Pennsylvania whose vehicles Wells Fargo repossessed between January 25, 2010 and January 25, 2016.[189] The query returned 11,741 unique accounts.[190] Of those unique accounts, 11,414 received a different First Sale Notice than the one Patricia McDonald received.[191] As the difference between 11,741 and 11,414 is 327, the potential class appears to consist of 327 plaintiffs. But Mr. Sonner swore "only 200" of the 11,741 unique accounts "(including Patricia McDonald's account) are designated as originating in Ohio."[192] We decipher the discrepancy to

mean 200 accounts with last-known addresses in Pennsylvania received Ohio notices, and the remaining 127 accounts with last-known addresses in Pennsylvania received notices from a state other than Pennsylvania or Ohio.[193] We do not presently have evidence regarding notices from states other than Pennsylvania or Ohio. The Estate's counsel argued at our March 18, 2019 hearing it would examine the notices sent to the 327 Wells Fargo customers with last-known addresses in Pennsylvania but who received non-Pennsylvania notices to ascertain class membership during class discovery.

In reviewing a motion for class certification, we act as a fiduciary for absent class members and protect the interests of the federal judicial system.[194] We may certify a class if the Estate shows the class's members are ascertainable and the movant satisfies the requirements of Federal Rule of Civil Procedure 23.[195] The Estate must first show, as "an essential prerequisite" of its Rule 23(b)(3) class, "that the class is currently and readily ascertainable based on objective criteria."[196] Next, the Estate must demonstrate its class meets the Rule 23(a) requirements: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the Estate's claims or defenses are typical of the claims or defenses of the class, and (4) the Estate will fairly and adequately protect the interests of the class.[197]

Finally, the Estate must demonstrate two additional criteria to certify its class under Rule 23(b)(3): (1) questions of law or fact common to class members predominate over questions affecting only individual members, and (2) class resolution is superior to other methods.[198] We must "assess all of the relevant evidence admitted at the class certification stage,"[199] and we may certify a class only if we are "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."[200] After our rigorous analysis, we decline to certify the Estate's proposed class finding a lack of typicality, predominance or superiority.

### 1. We can ascertain the class members.

Class ascertainability is "an essential prerequisite of a class action . . . under Rule 23(b)(3)."[201]  "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"[202]  The ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'"[203]  Still, a "party's assurance to the court that it intends or plans to meet the requirements [of Rule 23] is insufficient."[204]

The Estate "may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful."[205]  The mechanism also must be administratively feasible, meaning "identifying class members is a manageable process that does not require much, if any, individual factual inquiry."[206]  We "must undertake a rigorous analysis" to "ensure that class members can be identified 'without extensive and individualized fact-finding or "mini-trials,"' a determination which must be made at the class certification stage."[207]  First, we will analyze whether the class is defined with reference to objective criteria.  Second, we will analyze whether the Estate's proposed mechanism can (1) identify the class members who fall within its definition, and whether (2) the mechanism is administratively feasible.

### a. The class is defined with reference to objective criteria.

The Estate met its burden to show the class is defined with reference to objective criteria as to its Commercial Code and conversion claims.  As to the Article 9 claim, whether the Notices recanted the reinstatement right or failed to include the notices required by the MVSFA are objective inquiries.[208]  The General Assembly repealed the MVSFA effective December 1,

2014,[209] and the Estate seeks to certify a class of people who received such notices both before and after the MVSFA's repeal. We do not find a problem with such a posture, as the Estate is bringing its claim under section 9610, not the MVSFA.

The Estate also proceeds to trial on the conversion claim, which raises previously discussed statute of limitations concerns. The Estate's conversion claim is timely because it sued fewer than two years after it opened the Estate.[210] But others who do not have an open estate in the class are not subject to the same tolling period. Under Pennsylvania law, conversion claims have a two-year statute of limitations.[211] The putative class members for a conversion claim must have had their car repossessed on January 25, 2014 or later to fall within the two-year statute of limitations. Assuming a class can proceed, we would treat the conversion plaintiffs as a separate subclass.

### b. The Estate has shown a reliable and administratively feasible mechanism for determining Class membership.

The Estate did not propose a mechanism of ascertainability in its Motion for class certification. Wells Fargo argues the class is unascertainable because Wells Fargo cannot identify a customer's state of residence at the time of their loan's origination or repossession without "performing an account-by-account review."[212] Wells Fargo argues this account-by-account review necessitates individualized inquiries into every potential class member. In response, the Estate modified its class definition but still failed to propose any mechanism of ascertainability.[213] The Estate first proposed an ascertainability mechanism during our March 18, 2019 hearing. The Estate's counsel argued he could ascertain class membership by parsing through Wells Fargo's documents to identify which Pennsylvania residents received non-Pennsylvania notices, like Patricia McDonald.

We are concerned with proposing an ascertainability method for the first time at a hearing as it affects the "rigorous analysis" our Court of Appeals requires for class certification. Some

courts deny class certification when the lead plaintiff fails to propose an ascertainability method.[214] Other courts deny class certification even where the lead plaintiff proposed an ascertainability method.[215] Still, we recognize the Supreme Court permits us to "probe behind the pleadings before coming to rest on the certification question."[216]

We found Estate's counsel persuasive as to ascertainability at our March 18, 2019 hearing. As a result, we will examine the Estate's proposed mechanism to see if it (1) identifies whether members fall within the class definition in (2) a reliable and administratively feasible way. This requires an analysis of our Court of Appeals' ascertainability decisions.

### i. The proposed mechanism identifies members who fall within the class definition.

Our Court of Appeals addressed the ascertainability standard in *Marcus v. BMW of North America, Inc.*[217] The plaintiff owned a BMW equipped with "run-flat tires" (RFTs), which, as the name implies, were tires BMW advertised could run even when flat.[218] Plaintiff sued BMW alleging it violated consumer laws selling the tires, and sought to certify a class "consisting of [any] and [a]ll current and former owners and lessees of 2006, 2007, 2008, and 2009 BMW vehicles equipped with run-flat tires manufactured by Bridgestone . . . and sold or leased in [New Jersey] whose tires have gone flat and been replaced."[219] Our Court of Appeals identified "serious ascertainability concerns."[220] BMW could not identify which of the vehicles in the class definition had Bridgestone RFTs or whether cars which came onto the lot with Bridgestone RFTs left with the same tires.[221] Important for our purposes, BMW's records could not indicate whether a potential plaintiff's tires had "gone flat and been replaced" as the class definition required.[222] Remanding, our Court of Appeals directed the district court to "resolve the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative."[223]

Our Court of Appeals fashioned similar holdings in both *Hayes v. Wal-Mart Stores, Inc.*[224] and *Carerra v. Bayer Corp.*[225] In both cases, our Court of Appeals remanded class certifications upon finding neither defendant kept records with which plaintiffs could ascertain class membership.[226] Later, our Court of Appeals synopsized *Marcus* and *Carrera* by explaining those cases "focused on whether objective records *could* readily identify class members."[227]

Shortly thereafter, our Court of Appeals identified a situation where objective records could readily identify class members. In *Byrd v. Aaron's, Inc.*,[228] the plaintiffs sued a computer retailer, Aaron's, and its franchisee for selling computers contaminated with Spyware called "Detective Mode."[229] Plaintiffs sought to certify a class of "[a]ll persons who leased and/or purchased one or more computers from Aaron's, Inc. or an Aaron's, Inc. franchisee, and their household members, on whose computers . . . Detective Mode was installed and activated without such person's consent on or after January 1, 2007."[230] The district court found the proposed class unascertainable because, as particularly relevant here, the class constituted both an under- and over-inclusive definition of the potential class members.[231] Our Court of Appeals reversed, explaining the ascertainability requirement does not concern inclusivity.[232] Our Court of Appeals cited the district court's finding Aaron's records could "reveal the computers upon which Detective Mode was activated, as well as the full identity of the customer who leased or purchased each of those computers."[233] These "objective records" could readily identify class members.[234]

Corporate records also provided potential grounds for ascertainability in *City Select Auto Sales Inc. v. BMW Bank of North America.*[235] The plaintiff car dealership sued Creditsmarts, a company which put car dealers in contact with lending services, and BMW Bank of North America, a lender who contracted with Creditsmarts. The plaintiff alleged Creditsmarts sent unsolicited faxes to independent car dealers on behalf of BMW in violation of federal law.[236]

Plaintiff sought to certify a class of "[a]ll auto dealerships that were included in the Creditsmarts database on or before December 27, 2012, with fax numbers identified in the database who were sent one or more telephone facsimile messages between November 20, 2012 and January 1, 2013, that advertised the commercial availability of property, goods or services offered by 'BMW Bank of North America.'"[237]   But during discovery, Magistrate Judge Schneider denied plaintiff's motion to compel production of the Creditsmarts database.[238]   The district court then found even had the defendants produced the database, plaintiffs could not use it to identify which customers actually received faxes because the mere presence of a fax number did not necessarily mean the customer received a fax.[239]   Due to the over-inclusivity of the database, the district court denied class certification.[240]   Our Court of Appeals reversed.  It stressed plaintiffs "need not, at the class certification stage, demonstrate that a single record, or set of records, *conclusively* establishes class membership."[241]   Our Court of Appeals explained the database "define[d] a limited set of potential claimants,"[242] so "[t]he only factual inquiry required to determine class membership is whether a particular dealership in the database received the BMW fax on one of the dates in question."[243]

We can sort our Court of Appeals' decisions defining ascertainability into two groups: (1) the *Marcus-Hayes-Carrera* trilogy, where our Court of Appeals found objective records could not identify potential class members; and (2) the *Byrd-City Select* duo, where our Court of Appeals showed how objective records or affidavits could identify potential class members.[244]   Our "rigorous" review of the record confirms this case falls into the second group.

Ascertainability is of importance here because of the requisite choice-of-law analysis. Pennsylvania law must apply to a potential plaintiff for the plaintiff to be in the class because Ohio law does not provide a survivorship action.[245]   Pennsylvania law applies to a potential plaintiff if the potential plaintiff lived in Pennsylvania when Wells Fargo repossessed its car because

Pennsylvania has the paramount interest in applying its consumer protection provisions to protect resident debtors. So to determine class membership—dependent on whether Pennsylvania law applies to customers whose accounts originated in Ohio—we must determine where individual class members lived at the time of repossession.

Wells Fargo's declarant Mr. Sonner swears Wells Fargo's records can identify debtors who can bring a Commercial Code claim or a conversion claim. Mr. Sonner ran a query of accounts whose cars Wells Fargo repossessed in a certain timeframe.[246] The query revealed 200 accounts with loans originating in Ohio like Patricia McDonald's account.[247] He limited the query to people with last-known addresses in Pennsylvania.[248] Though Mr. Sonner warns a last-known address is not necessarily the same address a customer may have had at the time of repossession, he notes Wells Fargo can determine a customer's state of residence at the time of repossession by "performing an account-by-account review."[249] As a result, for section 9610 claims, the records can identify customers who, from January 25, 2010 to January 25, 2016, received notices failing to inform to recant their minimum bid price or failing to include reinstatement rights, the place the vehicle was stored, or the right to obtain personal property left in the vehicle. And for the conversion claim, the notices can identify customers who, from January 25, 2014 to January 25, 2016, had their cars repossessed.

The "account-by-account" review makes Wells Fargo's database closely mirror the database from *City Select*. Much like the *City Select* database could not identify whether a customer received a fax without an individual inquiry, the Wells Fargo database cannot identify a customer's state of residence at the time of repossession without performing an account-by-account review. And much like the *City Select* database left one factual inquiry—whether a potential plaintiff received a fax—for the district court to determine, we too have one factual

inquiry to determine: where did each of the customers who received non-Pennsylvania notices live at the time of repossession? Wells Fargo's records *can* resolve this factual inquiry after an account-by-account review. While the database may be over-inclusive, such a consideration is relevant only toward our determination of whether the proposed mechanism is administratively feasible. The account-by-account review constitutes a mechanism to identify potential class members.

### ii. The proposed mechanism is reliable and administratively feasible.

The mechanism must also be reliable and administratively feasible. In *Byrd*, after finding the plaintiffs' proposed mechanism could identify class members who bought contaminated computers, our Court of Appeals held the method was not administratively infeasible.[250] Our Court of Appeals found "[t]here will always be some level of inquiry required to verify that a person is a member of a class,"[251] and "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification."[252] Our Court of Appeals cautioned its ascertainability jurisprudence "does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken," as, "if that were the case, no Rule 23(b)(3) class could ever be certified."[253]

Our Court of Appeals continued to address administrative feasibility in *City Select*. After our Court of Appeals decided the database could identify class members, it discussed administrative feasibility.[254] Our Court of Appeals took "no position" on whether discovering who received faxes was administratively feasible, because our Court of Appeals did not have the database in the record.[255] Still, our Court of Appeals addressed the amount of over-inclusivity as an important inquiry in determining feasibility:

> We take no position on whether the level of individualized fact-finding in this case is administratively infeasible because we are limited by the record before us, which does not include the Creditsmarts database. The determination whether there is a reliable and administratively feasible mechanism for determining whether putative

class members fall within the class definition must be tailored to the facts of the particular case. *The amount of over-inclusiveness, if any, of the proposed records is a critical consideration.*[256]

Even if it is true that the BMW fax was not sent to every customer who had a fax number in the database during the relevant time period, the class could still be certified, so long as there is a method for determining which customers *did* receive such faxes, which could be by affidavit. *While a high degree of over-inclusiveness could prevent certification, any degree of over-inclusiveness will not do so.*[257]

Our rigorous review confirms the Estate's proposed mechanism is reliable and administratively feasible because the Wells Fargo database does not contain a high degree of over-inclusiveness. The Estate must analyze the records of only 327 customers who received non-Pennsylvania notices to ensure Wells Fargo repossessed their cars in Pennsylvania. As our Court of Appeals directed in *Byrd*, the mere need to review some records will not preclude certification. We think this is the precise situation our Court of Appeals warned of in *Byrd*; were we to disallow the Estate's proposed "level of inquiry" into Wells Fargo's records, certifying any Rule 23(b)(3) class would become nearly impossible. While some of Wells Fargo's records might show the customers did not have their cars repossessed in Pennsylvania, as in *City Select*, some over-inclusiveness will not foil an otherwise-proper ascertainability method. We find no apparent need for plaintiffs to submit affidavits affirming they had their car repossessed in Pennsylvania, as Wells Fargo's records should answer this inquiry.[258] The proposed class here is similar to a class alleging violations of the Fair Debt Collection Practices Act Judge Slomsky recently found ascertainable.[259] Meanwhile, the proposed class is distinguishable from proposed classes found unascertainable where the proposed class definition or record-searching process would be overly complex.[260] We find the Estate's proposed mechanism reliable and administratively feasible.

### 2.  The Estate meets all of Rule 23(a) requirements except typicality.

We now turn to the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy.

#### a.  Numerosity

The Estate satisfies the numerosity requirement.  The "number of class members is the starting point of our numerosity analysis."[261]  "While [n]o minimum number of plaintiffs is required to maintain a suit as a class action," our Court of Appeals instructs "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[262]  The Estate has shown a potential number of plaintiffs of 327, thereby meeting the numerosity requirement.

#### b.  Commonality

The Estate satisfies the commonality requirement.  Commonality is demonstrated where the plaintiff "share[s] at least one question of fact or law with the grievances of the prospective class."[263]  The commonality requirement "demands proof that a classwide proceeding will generate 'common answers apt to drive the resolution of the litigation.'"[264]  Here, the same common questions drive the class members' claim: Whether those who received notices failing to recant the minimum bid or failing to meet the MVSFA requirements made their dispositions commercially unreasonable or suffered a conversion.  The class meets the commonality requirement.

#### c.  Typicality

We must focus on three issues in evaluating typicality: "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative

must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class."[265]  "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."[266]  Wells Fargo argues the Estate's claims are not typical of the class members' claims because many of the class members received Pennsylvania form notices and the Estate's claims are subject to defenses inapplicable to most of the class members.

Wells Fargo's first argument no longer applies because the Estate modified its class definition to include only Pennsylvania residents who received non-Pennsylvania notices.  Wells Fargo makes no argument the Ohio notices are not standard form—to the contrary, Wells Fargo refers to the notices as "Ohio form notices."[267]  Should the Estate discover notices including a warning about reclaiming property during its review of Wells Fargo's documents, those who received such notices could not be class members.  But we currently have no reason to expect Wells Fargo's Ohio notices are non-uniform.

Wells Fargo next argues the Estate alone is subject to a (1) defense Ohio law applies to the transaction, a (2) defense Patricia McDonald could not reinstate the contract after she defaulted, (3) a defense the conversion claim is subject to statute of limitations defenses, and (4) a defense the Estate cannot recover under the Commercial Code because no debtor existed when Wells Fargo failed to comply with the Commercial Code and, even if one existed, Wells Fargo did not know the identity and means of communicating with the debtor.

We disposed of the choice of law defense in our summary judgment analysis.  The second defense, availability of reinstatement, is simply a question of fact, as we addressed in our summary

judgment analysis; it is not a defense atypical to the Estate. And the third defense, statute of limitations, does not bear on typicality. "While the statute of limitations defense may ultimately affect an individual's right to recover, it does not affect the presentation of the liability issues."[268] Typicality tests whether the Estate's interests are aligned with those of the class members and whether the same factual basis gives rise to each group's claims. Both elements are met here.

As we describe in our summary judgment analysis, Wells Fargo has not shown section 9625 immunizes it from liability merely because the McDonald family did not open an Estate before Wells Fargo's repossession and sale. Under section 9628, however, Wells Fargo makes a more persuasive showing the Estate is subject to a defense inapplicable to many members of the proposed class and likely to become a focus of litigation. Section 9628 provides "[a] secured party is not liable because of its status as secured party to . . . [a] person that is a debtor or obligor unless the secured party knows: (i) that the person is a debtor or obligor; (ii) the identity of the person; and (iii) how to communicate with the person."[269]

Without resolving the merits of Wells Fargo's defense as a matter of law, we find it carries persuasive force. Wells Fargo argues it sent Patricia McDonald notices for years after she died. Someone paid monthly for years. Wells Fargo argues it did not know Rick McDonald's role in the Contract and did not know how to communicate with a debtor other than recognizing monthly payments paid on an account held by Patricia McDonald. Rick McDonald's numerous statements representing his mother as alive and ill after her death bolster this defense. Wells Fargo's argument has already constituted a major focus of litigation and we expect the parties to continue disputing this issue at trial. This defense is unique to the McDonalds, as the purchase occurred under unusual circumstances and the borrower died before default. The Estate has not shown this defense would apply to other class members.

Wells Fargo adduced substantial fact-based defenses to liability under section 9610 and for conversion. These defenses relate to the unique nature of the deceased debtor, payments by someone else, notices reviewed by someone else, and someone other than the debtor meeting with the repossession agent. While not as strong a disqualifier as failure to show predominance and superiority, the Estate has not presently met its burden of overcoming the substantial defenses to its claims which would appear to be atypical for debtors.

### d. Adequacy

In assessing the adequacy requirement, we must ensure the representative party "fairly and adequately protect[s] the interests of the class."[270] "The adequacy requirement has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs."[271] Wells Fargo argues the Estate has failed to show both elements. We disagree.

### i. The Estate's counsel can adequately represent the class.

In examining adequacy, we must "test[] the qualifications of the counsel to represent the class."[272] Class counsel must "serve the interests of the *entire* class."[273] Rule 23(g) governs "questions concerning the adequacy of class counsel."[274] Under Rule 23(g), we must consider "[1] the work counsel has done in identifying or investigating potential claims in the action; [2] counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; [3] counsel's knowledge of the applicable law; and [4] the resources that counsel will commit to representing the class."[275] We may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[276] We will assess the qualifications of Attorneys Robleto, Kuruce, and Fabian under these factors.

The first factor, "the work counsel has done in identifying or investigating potential claims in the action," favors certification. Counsel for the Estate worked on this case since 2016 and obtained remand of our earlier dismissal. Counsel countered motions for summary judgment and from intervenors and timely moved for class certification. Counsel appeared well-prepared and presented persuasive arguments at our March 18, 2019 hearing. On the other hand, counsel deposed no Wells Fargo representatives.[277] And the Estate's counsel moved to strike Mr. Sonner's declaration—even though it provides the only evidence in the record regarding ascertainability.[278] But we are mindful the lack of discovery and motion to strike could have been strategic, as the core of the Estate's case focuses on Wells Fargo's Notices; counsel had already obtained copies of the forms sent to the Estate before discovery. We will not hold such choices against the Estate at this stage.

The second factor, "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action" is indeterminate. Attorneys Robleto and Kuruce identify only one class action they have worked on without identifying the result of the case. Attorney Fabian[279] represents the "vast majority" of cases he worked on from 1998 to 2002 were consumer class actions, without identifying results. Attorney Fabian's verification contains several typographical errors[280] and an unfinished sentence about his class action experience.[281] Counsel's reply to Wells Fargo's adequacy argument contains more typos.[282]

The third factor, "counsel's knowledge of the applicable law," is also indeterminate. Counsel for the Estate did not argue the ascertainability requirement in their Motion for class certification and in their reply to Wells Fargo's argument about ascertainability, counsel still failed to propose a mechanism for ascertaining class membership. But we found Attorney Robleto well-prepared at our March 18, 2019 hearing, at which he argued ascertainability.

The fourth factor, "the resources that counsel will commit to representing the class," favors class certification. Counsel defended several depositions and pursued class certification since filing suit. We do not doubt three attorneys can adequately protect the interests of a potential class of 327 members.

On balance, we find the Estate's counsel adequate to represent the relatively small class of debtors. We find most persuasive the first factor of the work counsel has done in identifying or investigating potential claims in the action. Counsel presented persuasive arguments on behalf of the class through litigation spanning three years.

### ii. The Estate does not have disqualifying conflicts of interest.

Wells Fargo argues Liane McDonald does not possess adequate knowledge to represent the class. Wells Fargo argues Liane McDonald testified she is only "vaguely" aware of the installment contract's details, she relies on Rick to manage the lawsuit, she gave evasive discovery responses, and she is unaware of a judgment entered against her in a previous lawsuit. Second, Wells Fargo argues fraud taints the Estate's ability to represent the class because Rick is the *de facto* lead plaintiff, coordinating the lawsuit while Liane is the lead plaintiff only "on paper." Third, Wells Fargo argues Liane McDonald's status as administratrix of her estate gives her a conflict of interest rendering her inadequate. We disagree.

### iii. The Estate possesses adequate knowledge to represent the class.

"A class representative need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.'"[283] In assessing adequacy, we should consider "the proposed representative's knowledge of the case, interest in and enthusiasm for the litigation and for representing the class, her willingness to respond to interrogatories and depositions, and her understanding of the role and duties of a class representative."[284] We also remain mindful

"[e]xperience teaches that it is counsel for the class representative and not the named parties" who direct and manage class actions.[285]

Liane McDonald meets the low standard of knowledge necessary to meet the adequacy standard. Liane McDonald sat for a deposition and competently answered questions regarding the basis of her lawsuit and the duties of a class representative.[286] Liane McDonald testified she became administratrix of Patricia's estate to "help the family"[287] and she talks to her husband "every day."[288] Though not always with specificity, she explained her answers to interrogatories.[289] The Estate has shown she possesses the "minimal degree of knowledge" necessary to represent the class. The only authority to which Wells Fargo directs us supporting its argument is a case in which the court found the class representatives' testimony "replete with inconsistencies and severely lacking in credibility."[290] Liane McDonald's testimony passes this test.

Second, Wells Fargo argues fraud taints Liane McDonald's ability to represent the class because Rick, who is inadequate to represent the class, is the *de facto* plaintiff. Rick McDonald has been involved with the litigation, but Liane McDonald has displayed an adequate level of knowledge and interest in the case to serve as lead plaintiff. As Rick McDonald is Liane McDonald's husband and he used the GMC Sierra, we would expect Rick McDonald to provide facts and consult with Liane McDonald as she administers her mother-in-law's estate. Wells Fargo still argues Liane McDonald herself made misrepresentations related to the suit. Courts have found inadequate "representatives who were dishonest or lacked candor about matters central to the litigation itself."[291] But the only dishonesty Wells Fargo identifies is the Estate's purported authorization of Attorney Sobkiewicz to tell Wells Fargo he represented the deceased Patricia McDonald before her estate had been established.[292] Liane McDonald's deposition testimony does

not establish the Estate directed Attorney Sobkiewicz to defraud Wells Fargo by saying who he represented.

Finally, Wells Fargo argues Liane McDonald possesses a conflict of interest because she represents both the Estate and a class of debtors. The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."[293] A "conflict must be fundamental to violate Rule 23(a)(4)."[294] "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class."[295] "A conflict that is unduly speculative, however, is generally not fundamental."[296] In the context of an estate administratrix representing a class, courts "will normally permit the Estate's representative to be substituted for the decedent as the class's representative" where the class representative dies during the litigation.[297]

Wells Fargo has not identified a "fundamental" conflict based on Liane McDonald's position as administratrix of the Estate—at best, it has pointed out an "unduly speculative" conflict. Wells Fargo argues Liane McDonald cannot rectify her duty to "preserve and protect" the Estate's property with her duty to vindicate the interests of the class plaintiffs. But all class actions share such a conflict. "For instance, if Mrs. [McDonald] herself were still alive and wished to pursue this litigation, [Wells Fargo] could argue that she has a conflict of interest because her personal interest in minimizing the expenses of the litigation may be inconsistent with her duty to maximize recovery for the class members."[298] Wells Fargo has not presented evidence the Estate is rushing to settle this lawsuit to the detriment of the class. As it stands, the conflict is speculative.[299]

### 3. The Estate fails to meet the Rule 23(b)(3) requirements for class certification.

The Estate also must satisfy Rule 23(b)(3): predominance and superiority. The Estate fails to meet either requirement.

### a.  Predominance[300]

"Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"[301]  The predominance inquiry derives from the Rule 23(a) commonality requirement, but it is "far more demanding."[302]  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."[303] "[I]ndividual damages calculations do not preclude class certification under Rule 23(b)(3)."[304] Still, we must ensure this is not a case "where the question of damages is so central that it can . . . overtake the question of liability."[305]

We today grant summary judgment to Wells Fargo on all the Estate's claims except: (1) a claim under section 9610 challenging Wells Fargo's repossession of the GMC Sierra as commercially unreasonable under the MVSFA and failing to recant the minimum bid in the January 4, 2013 Notice; and, (2) conversion.

Our analysis of predominance under section 9610 requires we also review section 9611 because the Estate also invokes section 9611 in its amended complaint.  We must pause to differentiate the two claims the Estate brings under sections 9610 and 9611.[306]

Section 9610 governs "[d]isposition of collateral after default."[307]  Commercial reasonableness is the linchpin of a secured transaction's legality under section 9610: "Every aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings."[308]  On the other hand, section 9611 specifically governs "*[n]otification* before disposition of collateral."[309]  It requires secured parties to send a "reasonable" authenticated notice of disposition to parties whose collateral it disposes of, omitting the descriptor "commercially."[310]  Through Article 9's damages provision, the General Assembly

acknowledged a distinction between the "commercially reasonable" standard of section 9610 and the "reasonable notification" standard of section 9611: "The principal limitations under this Part on a secured party's right to enforce its security interest against collateral are the requirements that it proceed in good faith (section 1-203), in a commercially reasonable manner (sections 9-607 and 9-610), and, in most cases, with reasonable notification (sections 9-611 through 9-614)."[311] The Commercial Code identifies specific situations which are "commercially reasonable."[312] The Estate has not shown a specific violation of the Commercial Code. Rather, we allow the Estate to proceed on claims under the MVSFA or failure to recant the minimum bid makes the disposition commercially unreasonable under section 9610 or result in unreasonable notification under section 9611.

### i. Whether the disposition is commercially reasonable and whether the notification is reasonable under are fact-intensive inquiries.

Regardless of whether we analyze the Estate's claims under a "commercially reasonable" or "reasonable" standard, we must perform a fact-intensive inquiry. To determine commercial reasonableness, Pennsylvania courts apply a "totality of the circumstances" test.[313] In the sales context, the determination of commercial reasonableness involves three factors: "(1) good faith, (2) avoidance of loss, and (3) an effective realization."[314] In the section of the Commercial Code titled "Determination of whether conduct was commercially reasonable," the comments provide where collateral is disposed of at a lower price than what the secured party could have obtained, "a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable."[315] In other words, a technical violation of the MVSFA does not render a disposition commercially unreasonable per se.[316]

The fact-intensive nature of the commercial reasonableness inquiry dooms the Estate's class or any class challenging Wells Fargo's conduct under Section 9610. We will not ask a jury

to conduct up to 327 individualized inquiries considering the totality of the circumstances to determine whether lack of notice is commercially unreasonable. A notice failing to include the property provision could still be commercially reasonable if, for instance, the debtor did not have any valuable property in the vehicle. In such a circumstance, the factor of "avoidance of loss" would arguably not be present. Moreover, a jury would have to examine up to 327 separate scenarios to determine whether the commercially reasonable situations contemplated by Article 9 are present.[317] We found no case, nor does the Estate identify a case, where a court certified a contested class under section 9610.[318] As commercial reasonableness requires individualized inquiries, it is inappropriate for class treatment.

Likewise, whether a notification is reasonable is fact-intensive under section 9611. The section lists criteria a notification in a consumer goods transaction must have to be sufficient.[319] A notification failing to include all of the criteria is insufficient as a matter of law.[320] But section 9611 does not mention the MVSFA, so the notice's failure to include the MVSFA requirements does not render the notice unreasonable as a matter of law. Indeed, other Commercial Code provisions defining reasonable notification require a fact-finder deciding questions of fact.[321] As a result, whether the Notice is reasonable is again a question of fact for a jury to decide. And as with section 9610, a jury could answer the question of fact differently for different plaintiffs. In *Hudson v. Eaglemark Savings Bank*, for example, Judge Padova dismissed a claim under section 9612, the section requiring notice to be timely, where the plaintiff failed to allege "facts suggesting that Plaintiff could not act on or take account of the notification in a ten day period."[322] The same concept applies here—a notification failing to include information about property in a car may still be reasonable if the plaintiff had no property in the car.

### ii. Whether Wells Fargo converted debtors' property is an individualized inquiry.

"Under Pennsylvania law, conversion is defined as 'the deprivation of another's right of property in, or use or possession of, a chattel . . . [1] without the owner's consent and [2] without lawful justification.'"[323]  The consent element is not subject to classwide proofs.

The first element of conversion, consent, requires individualized inquiries. Under Pennsylvania law, "conversion claims are disallowed where such claims are based on the same facts as the contract claim and the proper remedy lies in breach of contract."[324]  Though we dismissed the breach of contract claim, we allowed the Estate to proceed on its conversion claim because a technical violation of the MVSFA can extinguish Wells Fargo's lawful justification to interfere with the Estate's chattel.  But the Pennsylvania law barring conversion claims when a contract exists speaks to the individualized nature of the consent inquiry.  We cannot infer a blanket absence of consent across the class even if Notices complied with all the criteria provided in Article 9.  This is especially so where the Contract advises, "If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it."[325]  Whether a debtor nonetheless consented to the repossession despite these arrangements is subject to individualized proof.[326]

Individualized damages calculations further weigh against a finding of predominance.  Under Pennsylvania law, the ideal "measure of damages for conversion is the market value of the converted property at the time and place of conversion."[327]  The "trier of fact" should "measure the value of the damages."[328]  Here, the Estate asks the trier of fact to measure the market value of up to 327 converted vehicles.  We are mindful individualized damages calculations alone do not preclude class certification, but the calculations are still another individualized inquiry the jury would have to conduct.

### b. Superiority

"A class action must represent the best 'available method[ ] for the fair and efficient adjudication of the controversy.'"[329]  To evaluate superiority, we "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."[330]  Our superiority analysis is bound up in our predominance analysis.  The same individualized inquiries precluding predominance also preclude superiority, as a jury could more easily adjudicate individualized proofs in separate proceedings.

### C.  Having found no basis to certify a class for the remaining Article 9 and conversion claims, we deny the motion to intervene to bring the same or similar Article 9 class claims.

Eight Pennsylvania citizens moved to intervene to bring a class action during the pendency of the cross-motions for summary judgment and the Estate's Motion for class certification.  Each of these Intervenors are Pennsylvania residents who purchased their vehicles in Pennsylvania. They moved to intervene on three grounds: failure of the Estate's counsel to diligently prosecute the matter; the Estate may not have standing as a representative plaintiff; and, significant issues of typicality, commonality and choice of law likely weakened the certification.  The Intervenors, whose individual interests are presently protected during the pendency of the Motion for class certification, move for intervention arguing their counsel is better prepared to bring this case.[331]

We carefully reviewed the Intervenors' proposed class action complaint in which they challenge arbitrary and unreasonable fees third parties allegedly charged when the debtor would redeem their repossessed vehicle; the right to reinstate their retail installment loan; or the adequacy of notice concerning their access to their personal possessions.  We addressed the Estate's claims to reinstate the retail installment loan and regaining access to personal possessions. The Estate brought a claim under these two theories, and we have found a triable issue as to the Estate.  The

Estate has not brought a challenge to third parties' assessment of fees to obtain its car. The Intervenors also seek to challenge Wells Fargo's notices which are admittedly different for Pennsylvania-originated loans than the ones raised by the Estate's Ohio-originated loan. This different set of allegations is not presently at issue.

The Intervenors argue the intervention is either mandated or permissive under Federal Rule of Civil Procedure 24. To allow mandatory intervention, we must find a timely application; an intervenor with sufficient interest in the case; a threat of the intervenor's interest being impaired by the disposition of this case; and, the existing Plaintiff does not adequately represent the prospective intervenor's interest.[332] The intervenor must meet each of these requirements.[333] We may also exercise our discretion to permit intervention to allow a claim or defense sharing a common question of law or fact after considering whether granting intervention will unduly delay or prejudice adjudication of the original parties' rights.[334]

The Intervenors' alleged notice claims under section 9610 are adequately protected by the Estate. We cannot certify those claims for class treatment either for the Estate or any other party as a lead representative not because of the adequacy of the Estate or its counsel, but because the issues arising under 9610, including those raised by the Intervenors, so predominate the shared questions of law to render a class action ineffective and not a superior method of resolving the debtor's claims. To the extent the Intervenors raised different substantive claims challenging third party fees or similar challenges, these claims are nowhere near the Estate's amended complaint. The Estate does not share these claims. Adding these claims would create a brand-new theory of liability and damages not raised by the Estate.

In any event, the Intervenor Plaintiffs may file their own individual claims as the statute of limitations to those individual claims has been tolled since the filing of this class action in 2016.[335]

We agree with the district court in *Lindblom v. Santander Consumer USA, Inc.*, finding the present intervenors move only to protect their ability to bring a class action.[336] The Intervenors' counsel admitted as much during oral argument asking only we rule the statute of limitations is tolled for the class action the Intervenors seek to bring albeit somewhat unrelated to the present claims. We are not aware of authority, nor could counsel show us any, allowing us to toll the statute of limitations for a subsequent class action. The Supreme Court recently held this remedy is not available. In its 2018 decision in *China Agritech, Inc. v. Resh*,[337] the Supreme Court held "*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails," "[b]ut *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations."[338]

But this unavailability does not leave the Intervenors in a worse position. To the extent their claim is timely, they could bring their claim as though it was 2016. To the extent they wish to obtain class status for different claims, they may be able to argue for tolling of related individual claims. There is no basis for mandatory intervention.

There is also no basis to exercise our discretion to allow the Intervenors to now join this case as individual plaintiffs in a case filed in 2016 seeking some, but not all, the same relief. We are scheduled for the trial of the Estate's individual claims beginning on June 25, 2019.[339] Allowing these parties to now intervene individually in this case will necessarily unduly delay the trial as each of the eight Intervenors needs to produce documents, be deposed and demonstrate the basis of their claims. Further, as they have the same ability to bring these claims in another court, we see no reason to exercise our discretion to burden the further progress of this case.

The Intervenors' challenges to the class counsel and the ability to consider certifying the class miss the point. We reject the Intervenors' arguments. We do not certify this case based on the adequacy of counsel or commonality, but rather due to the lack of predominance and superiority necessary for a class resolution for so many persons with different claims under both the Article 9 and conversion claims.

## III.    Conclusion

The Estate demonstrates genuine issues of material fact precluding summary judgment on its claims under section 9610 of Article 9 of the Pennsylvania Commercial Code relating to the Notices provided under the MVSFA and failure to recant the minimum price in the January 4, 2013 Notice and for conversion. The Estate's remaining claims must be dismissed as a matter of law as there are no genuine issues of matter fact precluding judgment.

Given the substantial individual issues raised in these remaining claims under section 9610 and for conversion, we are compelled to find the individual issues of reasonableness under section 9610 and consent for conversion predominate over the common issues and the class action is not a superior method of resolving this controversy. The unique nature of Wells Fargo's defenses to the Estate's claims also render the Estate an atypical class member unable to lead the class. We deny the Estate's Motion for class certification. We also deny the Intervenors' Motion to intervene as there is no basis for a class action and the Intervenors have the same rights today as they had in 2016 at the time the Estate filed this case.

---

[1] ECF Doc. No. 82-2 at 17 of 36 (N.T. R. McDonald, Dec. 12, 2018). *Id.* Rick McDonald resigned in 2005 from his position as Chief Executive Officer of World Health Alternatives. Mr. McDonald never returned to World Health Alternatives; after leaving the company, he worked at an ice rink and an equipment rental company. *Id.* at 14 of 36. Not long after resigning from World Health Alternatives, a confluence of circumstances in Rick McDonald's work and personal life required he purchase a new vehicle. Rick's McDonald's father, Richard McDonald, "was sick, he had had a bad infection, did a lot of rehabilitation." *Id.* Rick McDonald's truck "was breaking down a lot."

*Id.*  And his mother bought and sold antiques at the time.  Rick McDonald explained: "I think she also knew from all the things I had been telling her about my future, that it would be better if she bought it, and then that way if something did happen to me, she would have it."  *Id.* at 17 of 36.  Patricia McDonald, however, "thought it [would be] better if she bought the truck . . . in her name."  *Id.*

[2] *See* ECF Doc. No. 82-8.

[3] ECF Doc. No. 82-2 at 25 of 36 (N.T. R. McDonald, Dec. 12, 2018).

[4] *Id.* at 18, 23 of 36.

[5] *Id.* at 22 of 36.

[6] *Id.* at 22, 25 of 36.

[7] ECF Doc. No. 82-8 at 1 of 2.

[8] *Id.*; ECF Doc. No. 82-23 at ¶ 12.  "On October 4, 2008, the payment due date was moved from the 26th of the month to the 6th, resulting in the maturity date of the Contract changing to November 6, 2012."  ECF Doc. No. 82-23 at ¶ 12.

[9] ECF Doc. No. 82-8 at 2 of 2 ("If your default consists solely of a failure to pay a payment on time, we may demand that you pay all that you owe on this contract only if your failure to pay has continued for at least thirty (30) days.").  The "Late Charge" provision of the Contract provides "[i]f payment is not received in full within 10 days after it is due, you will pay a late charge of $20 or 5% of the part of the payment that is late, whichever is greater."  *Id.* at 1 of 2.

[10] *Id.*  Due to the small font size, some of the numbers on the Contract are difficult to discern.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] ECF Doc. No. 106 at ¶ 51.

[15] ECF Doc. No. 81 at ¶ 54.  The Estate disputes this characterization but does not dispute: (1) Rick McDonald in January 2010 "told Wells Fargo that Patricia has been sick and was in the hospital," ECF Doc. No. 106 at ¶ 55; (2) Rick McDonald in August 2010 "told Wells Fargo that Patricia was sick," *id.* at ¶ 56; (3) Rick McDonald in March 2011 "told Wells Fargo that Patricia was not making payments due to illness and that he was trying to assist her," *id.* at ¶ 57; (4) Rick McDonald in September 2011 "told Wells Fargo that he is helping Patricia out because she has been sick," *id.* at ¶ 58; (5) Rick McDonald in April 2012 "told Wells Fargo that Patricia has been ill and he is helping out with bills," *id.* at ¶ 59; (6) Rick McDonald in July 2012 "told Wells Fargo

that Patricia was severely ill," *id.* at ¶ 60; and (7) Rick McDonald in August 2012 "told Wells Fargo that Patricia had breast cancer and was on hospice care," *id.* at ¶ 61.

[16] ECF Doc. No. 82-23 at ¶ 18 ("The Account records show that the Account had been delinquent in varying amounts as early as May 2007 and was continuously in default from August 6, 2012 through the repossession due to the failure to make payments.").

[17] *Id.* at ¶ 20 ("On November 28, 2012, the GMC Sierra was repossessed from the address of 4199 Leechburg Road, New Kensington, PA 15068. At that time, the loan was in payment default.").

[18] *Compare* ECF Doc. No. 83 at 5 (arguing "because the loan had fully matured on November 6, the loan could not be reinstated"); *id.* at 21 n.12 ("Patricia (had she been alive) had the option to pay the total outstanding debt—the accumulated missed payments—to redeem the vehicle, but there was nothing to reinstate."); *with* ECF Doc. No. 82-9 at 2 of 2 (stating "[y]ou have the right to reinstate this default until [12/20/12]").

[19] ECF Doc. No. 82-9.

[20] *Id.* at 1 of 2.

[21] *Id.*

[22] *Id.* at 2 of 2.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] ECF Doc. No. 82-11.

[27] ECF Doc. No. 82-1 at 39 of 68 (N.T. L. McDonald, Nov. 12, 2018).

[28] *Id.*

[29] ECF Doc. No. 82-21 at 1 of 2.

[30] *Id.*

[31] ECF Doc. No. 82-13.

[32] *Id.* at 1 of 2.

[33] *Id.*

[35] ECF Doc. No. 82-1 at 41 of 68 (N.T. L. McDonald, Nov. 12, 2018).

[36] ECF Doc. No. 82-5; ECF Doc. No. 106 at ¶ 110.

[37] ECF Doc. No. 1-2.

[38] 13 Pa.C.S.A. § 9610(b).

[39] ECF Doc. No. 12 at ¶ 7.

[40] *Id.* at ¶ 8.

[41] *Id.* at ¶ 57.

[42] *Id.* at ¶ 7.

[43] ECF Doc. No. 19 at 7.

[44] ECF Doc. No. 38 (Order); ECF Doc. No. 39 (Memorandum).

[45] *McDonald v. Wells Fargo Bank, N.A.*, 735 F. App'x 776, 779 (3d Cir. 2018).

[46] *Id.* at 779–80.

[47] *Id.* at 780.

[48] Wells Fargo argued, among other things, Ohio law applies to each of Liane McDonald's statutory claims, mandating dismissal because the Estate can proceed only under Pennsylvania law; the conversion claim, Wells Fargo argued, fails because it is "barred by the two-year statute of limitations," "barred by the 'gist of the action' doctrine," and Wells Fargo repossessed the Sierra in compliance with the parties' Contract.  ECF Doc. No. 47 at 12.  We denied Wells Fargo's motion to dismiss.  *See* ECF Doc. No. 59 (Order); ECF Doc. No. 58 (Memorandum).  We found the Estate plausibly alleged Pennsylvania law applied to its statutory and conversion claims but invited the parties to revisit the issue at summary judgment.  *See* ECF Doc. No. 58 at 9 ("At this preliminary stage, the balance of these factors tilts toward Pennsylvania law.  We are mindful, however, the parties may discovery material information about their contacts and relationship warranting consideration of this issue anew at summary judgment.").  We also found the Estate's Commercial Code and conversion claims survived dismissal under Rule 12(b)(6)'s plausibility standard.  *See id.* at 9–12.

[49] We set a two-phase discovery process.  *See* ECF Doc. No. 63 at 2. In phase one, we directed the parties to take discovery needed to "prepare motions and responses for class certification and for summary judgment on [the Estate's] individual claims."  *Id.*  The second phase, if warranted,

63

would allow the parties to take discovery needed to "prepare for trial of the Plaintiff's individual claims or the claims of the defined class." *Id.*

[50] ECF Doc. No. 111 at ¶ 1.

[51] *Id.* at ¶¶ 1–5.

[52] *See* ECF Doc. No. 80 (Wells Fargo's Motion for Summary Judgment); ECF Doc. No. 83 (Wells Fargo's Brief in Support of Motion for Summary Judgment); ECF Doc. No. 84 (Estate's Motion for Summary Judgment); ECF Doc. No. 89 (Estate's Brief in Support of Motion for Summary Judgment); *see also* ECF Doc. No. ECF Doc. No. 94 (Wells Fargo's Brief in Opposition to Liane McDonald's Motion for Summary Judgment); ECF Doc. No. 101 (Estate's Reply Brief in Support of Summary Judgment); ECF Doc. No. 98 (Estate's Brief in Opposition to Wells Fargo's Motion for Summary Judgment); ECF Doc. No. 99 (Wells Fargo's Reply Brief in Support of Motion for Summary Judgment).

[53] *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007).

[54] ECF Doc. No. 82-8 at 2 of 2. "[A]ddress shown," the parties do not dispute, refers to Performance GMC's Ohio business address. *See McDonald*, 735 F. App'x at 778 n.2 ("The address on the front of Patricia McDonald's contract is located in Ohio.").

[55] *See Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999).

[56] *Grimm v. Discover Fin. Servs.*, No. 08-747, 2008 WL 4821695, at *7 (W.D. Pa. Nov. 4, 2008).

[57] *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994).

[58] ECF Doc. No. 82-8 at 2 of 2 (emphasis added).

[59] *Jiffy Lube*, 848 F. Supp. at 576.

[60] ECF Doc. No. 83 at 8.

[61] ECF Doc. No. 98 at 5; *see also id.* at 6 (arguing "[t]he Estate's claims [are] not contract claims, they arise from Pennsylvania's statutes").

[62] *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. 12-1922, 2015 WL 1208128, at *10 (E.D. Pa. Mar. 17, 2015) (emphasis added).

[63] 13 Pa.C.S.A. § 9602.

[64] 13 Pa.C.S.A. § 9602 cmt. 2.

[65] *Id.*

[66] *Grimm*, 2008 WL 4821695, at *8.

[67] *Heichel v. Marriott Hotel Servs., Inc.*, No. 18-1981, 2019 WL 318256, at *1 (E.D. Pa. Jan. 24, 2019) (quoting *Hammersmith*, 480 F.3d at 230).

[68] *McDonald*, 735 F. App'x at 780.

[69] *Hammersmith*, 480 F.3d at 230.

[70] *Woods Servs., Inc. v. Disability Advocates, Inc.*, 342 F. Supp. 3d 592, 608 n.9 (E.D. Pa. 2018).

[71] *Hammersmith*, 480 F.3d at 230 n.9.

[72] *Id.* at 230.

[73] 13 Pa.C.S.A. § 9602 cmt. 2.

[74] *McDonald*, 735 F. App'x at 780.

[75] *See* ECF Doc. No. 58 at 8 ("Ohio, unlike Pennsylvania, does not offer a survival action under which the Estate could bring these claims, indicating Ohio has at least some interest in protecting its businesses who seek protection under the laws of Ohio."); *see also Pac. Emp'r Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 436 (3d Cir. 2012) (emphasizing a state's "interest in protecting sophisticated business parties' freedom to enter into contracts without having their terms disregarded or rewritten by courts").

[76] *See* ECF Doc. No. 1 at ¶ 13 ("Wells Fargo Bank, N.A. is a national banking association with its main office located in Sioux Falls, South Dakota. Thus, it is a citizen of South Dakota for diversity purposes." (internal citation omitted)).

[77] *Hammersmith*, 480 F.3d at 230 (second alteration in original) (quoting *Cipolla v. Shaposka*, 267 A.2d 854, 856 (Pa. 1970)).

[78] *Id.* at 231 (quoting *Cipolla*, 267 A.2d at 856).

[79] *Id.* (quoting *Cipolla,* 267 A.2d at 856).

[80] *Id.* (second alteration in original) (quoting *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir. 1987)).

[81] *In re Actiq Sales & Mktg. Practices Litig.*, 790 F. Supp. 2d 313, 321 (E.D. Pa. 2011) (quoting *Karnuth v. Rodale, Inc.,* No. 03–742, 2005 WL 1683605, *4 (E.D. Pa. July 18, 2005)).

[82] *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 233 (3d Cir. 2010).

[83] We are mindful the RESTATEMENT (SECOND) OF CONFLICT OF LAWS separately addresses conflicts principles applicable to tort claims. For example, RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 147, governing "[i]njuries to [t]angible [t]hings," provides:

> In an action for an injury to land or other tangible thing, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied.

Although the parties do not dispute the Estate's conversion claim is governed by Pennsylvania law, we would reach the same result if we applied § 147 to the parties' entire relationship, because we find "the injury occurred" in Pennsylvania and Pennsylvania maintains a greater interest in applying its laws to this dispute.

[84] *Pac. Emp'r*, 693 F.3d at 436 (quoting *Hammersmith*, 480 F.3d at 232–33).

[85] *Grimm*, 2008 WL 4925631, at *5.

[86] ECF Doc. No. 58 at 8.

[87] And even if, as Rick McDonald testified at his deposition, Patricia McDonald signed additional documents in Pennsylvania and mailed them to the Ohio dealership, this fact alone would not tilt the balance of this factor away from Pennsylvania, where the McDonalds remained throughout the purchasing process.

[88] 13 Pa.C.S.A § 9614.

[89] *Id.* cmt. 2. The parties do not dispute Patricia McDonald purchased the GMC Sierra "[i]n a consumer-goods transaction," triggering application of 13 Pa.C.S.A. § 9614. The Pennsylvania Commercial Code defines a "[c]onsumer-goods transaction" as "[a] consumer transaction in which: (1) an individual incurs an obligation primarily for personal, family or household purposes; and (2) a security interest in consumer goods secures the obligation." 13 Pa.C.S.A. § 9102.

[90] 13 Pa.C.S.A. § 9614(1)(i).

[91] 13 Pa.C.S.A. § 9613(1).

[92] ECF Doc. No. 82-9 at 1 of 2.

[93] *Id.*

[94] 13 Pa.C.S.A. § 9613(1)(iv).

[95] ECF Doc. No. 82-9 at 1 of 2 (emphases added).

[96] *See* 13 Pa.C.S.A. § 9614(2) ("A particular phrasing of the notification is not required.").

[97] 13 Pa.C.S.A. § 9613(1)(iv) (emphasis added).

[98] 13 Pa.C.S.A. § 9613(1)(iv).

[99] 13 Pa.C.S.A. § 9614(1)(ii).

[100] ECF Doc. No. 82-9 at 1 of 2.

[101] *Id.* at 2 of 2.

[102] 13 Pa.C.S.A. § 9614(1)(iii).

[103] ECF Doc. No. 82-9 at 1 of 2.

[104] 13 Pa.C.S.A. § 9614(1)(iv).

[105] ECF Doc. No. 82-9 at 1 of 2.

[106] 13 Pa.C.S.A. § 9610(b) (emphasis added).

[107] *Cosgrove v. Citizens Auto. Fin., Inc.*, No. 09-1095, 2011 WL 3740809, at *1 (E.D. Pa. Aug. 25, 2011) (quoting 13 Pa.C.S.A. § 9611(b)).

[108] ECF Doc. No. 83 at 20.

[109] 13 Pa.C.S.A. § 9611 cmt. 8.

[110] *Id.* (emphasis added).

[111] ECF Doc. No. 82-9 at 1 of 2.

[112] ECF Doc. No. 82-11.

[113] ECF Doc. No. 89 at 5 (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[114] *Id.* (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[115] *Id.* (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[116] 13 Pa.C.S.A. § 9610(b).

[117] The parties do not dispute the Pennsylvania General Assembly codified the MVSFA's protections in substantially similar form at 12 Pa.C.S.A. § 6201 *et seq.* They also do not contest we must apply the version of the MVSFA in effect at the time of repossession and disposition of the GMC Sierra.

[118] 69 P.S. § 623(A)

[119] *See* 69 P.S. § 623(B).

[120] 69 P.S. § 623(D).

[121] ECF Doc. No. 89 at 5 (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[122] ECF Doc. No. 83 at 21–22.

[123] *See, e.g.*, *In re Patterson*, 263 B.R. 82, 93 n.18 (Bankr. E.D. Pa. 2001) ("Notably, the [Finance Act] provides no private cause of action to remedy a violation thereunder.").

[124] ECF Doc. No. 12 at ¶ 52.

[125] *Nawrocki v. Faulkner Ciocca Ford of Souderton*, No. 07-1827, 2007 WL 3146671, at *5 (E.D. Pa. Oct. 29, 2007).

[126] *Cosgrove*, 2011 WL 3740809, at *1.

[127] ECF Doc. No. 83 at 21 n.12.

[128] *Scott v. Fred Beans Chevrolet of Limerick, Inc.*, 183 F. Supp. 3d 691, 697–98 (E.D. Pa. 2016).

[129] 13 Pa.C.S.A. § 9625(c)(2).

[130] ECF Doc. No. 83 at 14 (emphasis omitted).

[131] ECF Doc. No. 98 at 9.

[132] 20 Pa.C.S.A. § 3381.

[133] *Morfesi v. Sherman*, No. 90-C-967, 1991 WL 495562, *1 (Pa. Ct. Com. Pl. Dec. 4, 1991).

[134] 13 Pa.C.S.A. § 9628(b)(1).

[135] ECF Doc. No. 83 at 16 (emphasis added).

[136] ECF Doc. No. 58 at 9–10.

[137] ECF Doc. No. 89 at 8–9 (quoting 13 Pa.C.S.A. § 9616(a)(4)).

[138] 13 Pa.C.S.A. § 9616(b)(1).

[139] 13 Pa.C.S.A. § 9616(c).

[140] ECF Doc No. 82-21 at 1 of 2; *see* 13 Pa.C.S.A. § 9616(c)(1).

[141] ECF Doc No. 82-21 at 1 of 2; *see* 13 Pa.C.S.A. § 9616(c)(2).

[142] ECF Doc. No. 82-21 at 1 of 2; *see* 13 Pa.C.S.A. § 9616(c)(3)

[143] 13 Pa.C.S.A. § 9616(c)(4).

[144] ECF Doc. No. 82-21 at 1 of 2.

[145] *Id.*

[146] ECF Doc. No. 89 at 9 (quoting 13 Pa.C.S.A. § 9616(a)(4)).

[147] *Id.*

[148] ECF Doc. No. 82-21 at 2 of 2 (emphasis omitted).

[149] *Id.* (emphasis added).

[150] 13 Pa.C.S.A. § 9616(a)(4)).

[151] ECF Doc. No. 89 at 11.

[152] ECF Doc. No. 94 at 15.

[153] *McDonald*, 735 F. App'x at 779 (citation and internal quotation marks omitted).

[154] No. 16-4144 (3d Cir.), July 19, 2017 Brief of Appellee Wells Fargo Bank, N.A. at 26–27, *McDonald*, 735 F. App'x 776 (3d Cir. 2018).

[155] *McDonald*, 735 F. App'x at 779 (emphasis added).

[156] *Id.* (second alteration in original) (quoting *Riner v. Riner*, 31 A. 347, 348 (Pa. 1895)).

[157] *Id.* (quoting *Riner*, 31 A. at 348).

[158] ECF Doc. No. 83 at 24 n.16.

[159] *Id.*

[160] 20 Pa.C.S.A. § 3376.

[161] *Prevish v. Nw. Med. Ctr. Oil City Campus*, 692 A.2d 192, 199 (Pa. Super. Ct. 1997), *aff'd*, 717 A.2d 1023 (Pa. 1998).

[162] *Id.* at 200 (emphasis omitted).

[163] *Id.* at 199.

[164] ECF Doc. No. 83 at 25 n.17.

[165] *McDonald*, 735 F. App'x at 779.

[166] *Chong v. 7-Eleven, Inc.*, No. 18-1542, 2019 WL 1003135, at *14 (E.D. Pa. Feb. 28, 2019) (quoting *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. Ct. 2007)).

[167] *Nationstar Mortg. LLC v. Radian Guar. Inc.*, No. 18-03798, 2019 WL 1318541, at *5 (E.D. Pa. Mar. 22, 2019) (quoting *Prudential Ins. Co. of Am. v. Stella*, 994 F.Supp. 318, 323 (E.D. Pa. 1998)).

[168] *Nawrocki*, No. 07-1827, 2007 WL 3146671, at *6.

[169] *Id.*

[170] ECF Doc. No. 89 at 5 (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[171] *Id.* (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[172] *Id.* (emphasis omitted) (quoting 69 Pa.C.S.A § 623(D)).

[173] ECF Doc. No. 106 at ¶ 77.

[174] ECF Doc. No. 82-1 at 10 (N.T. L. McDonald, Nov. 12, 2018).

[175] *Id.* at 11.

[176] *Id.* at 52–56.

[177] *Id.* at 4.

[178] ECF Doc. No. 88 at 7–8.

[179] ECF Doc. No. 96 at 9–13. A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim. Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

[180] ECF Doc. No. 103 at 4–6.

[181] ECF Doc. No. 95-1 at ¶ 3.

[182] *Id.* at ¶¶ 17–33.

[183] *Id.* at ¶ 7.

[184] *Id.*

[185] *Id.* at ¶ 16.

[186] *Id.* at ¶ 10.

[187] *Id.* at ¶ 12.

[188] ECF Doc. No. 82-23 at ¶ 22.

[189] *Id.* at ¶ 14.

[190] *Id.* at ¶ 15.

[191] *Id.*

[192] *Id.* at ¶ 16.

[193] At our March 18, 2019 hearing, the Estate's counsel referred to a potential class size of at least 211 debtors. We cannot ascertain how Mr. Sonner's declaration provides a potential minimum of exactly 211 debtors. We surmise counsel used 211 as a minimum because we referenced 211 as a hypothetical number during the hearing.

[194] *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995).

[195] *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

[196] *Id.*

[197] Fed. R. Civ. P. 23(a).

[198] Fed. R. Civ. P. 23(b)(3).

[199] *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 317, 323 (3d Cir. 2008) (internal quotations omitted)).

[200] *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir. 2006) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotations omitted)).

[201] *Carrera*, 727 F.3d at 306.

[202] *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Carrera*, 727 F.3d at 306)).

[203] *Id.* at 164 (emphasis added in original) (citing *Carrera*, 727 at 306 n.2 (3d Cir. 2013)).

[204] *Carrera*, 727 F.3d at 306 (alteration in original).

[205] *Id.*

[206] *Id.* at 307–08 (3d Cir. 2013) (quoting William B. Rubenstein & Alba Conte, Newberg on Class Actions § 3:3 (5th ed. 2011)).

[207] *Id.* at 306–07 (internal citation omitted) (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

[208] *See In Re Thalmoid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *20 (D.N.J. Oct. 30, 2018).

[209] 12 Pa.C.S.A. § 6201.

[210] *McDonald*, 735 F. App'x at 779 (quoting *Riner v. Riner*, 31 A. 347, 348 (Pa. 1895)).

[211] *Kingston Coal Co. v. Felton Min. Co.*, 690 A.2d 284, 288 (Pa. Super. Ct. 1997) ("The time period within which a litigant must file an action for conversion is delineated in 42 Pa.C.S.A. § 5524(3), which provides that '[a]n action for taking, detaining, or injuring personal property, including actions for specific recovery thereof,' must be commenced within two years of the taking or injury.").

[212] ECF Doc. No. 96 at 12.

[213] ECF Doc. No. 103 at 6.

[214] *See Carrow v. FedEx Ground Package Sys., Inc.*, No. 16-3026, 2018 WL 6630512, at *4 (D.N.J. Dec. 19, 2018) ("Plaintiffs offer no analysis, guidance, or methodology to determine whether putative class members experienced the same allegedly improper wage deductions. Plaintiffs' briefs offer only conclusory assertions—without the benefit of record citation . . . These conclusory assertions do not actually permit the Court to engage in the rigorous analysis required to determine if facts or evidence exist to discern whether all putative class members experienced the same wage deductions in a way that meets the various aspects of Rule 23."); *Parsons v. Phila. Parking Auth.*, No. 13-0955, 2016 WL 538215, at *4 (E.D. Pa. Feb. 11, 2016) ("Plaintiff has not suggested a mechanism by which putative class members can be identified and she has not responded to defendant's argument . . . I find that plaintiff has not met her burden of demonstrating the ascertainability of the proposed class."); *see also Gonzalez v. Corning*, 317 F.R.D. 443, 504 (W.D. Pa. 2016) ("Before proceeding with the analysis, the court notes that plaintiffs offer no briefing and submit no proposed findings of fact or conclusions of law directed to the ascertainability requirement for the proposed nationwide class. Given that it is plaintiffs' burden to establish that the nationwide class is ascertainable, the court could find on this basis alone that the proposed nationwide class cannot be certified." (citations omitted)), *aff'd*, 885 F.3d 186 (3d Cir. 2018).

[215] *See, e.g.*, *In re Domestic Drywall Antitrust Litig.*, No. 13-2437, 2017 WL 3700999, at *9 (E.D. Pa. Aug. 24, 2017); *Mladenov v. Wegmans Food Markets, Inc.*, 308 F.R.D. 127, 131–32 (D.N.J. 2015); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 06-1833, 2015 WL 3623005, at *9 (E.D. Pa. June 10, 2015); *Bello v. Beam Glob. Spirits & Wine, Inc.*, No. 11-5149, 2015 WL 3613723, at *11 (D.N.J. June 9, 2015); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. 05-485, 2014 WL 6601941, at *12 (D. Del. Aug. 6, 2014).

[216] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

[217] 687 F.3d 583 (3d Cir. 2012).

[218] *Id.* at 588–89.

[219] *Id.* at 590 (alterations in original).

[220] *Id.* at 593.

[221] *Id.*

[222] *Id.*

[223] *Id.* at 594.

[224] 725 F.3d 349 (3d Cir. 2013).

[225] 727 F.3d 300 (3d Cir. 2013).

[226] *Hayes*, 725 F.3d at 356; *Carrera*, 727 F.3d at 308–09.

[227] *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 184 n.5 (3d Cir. 2014) (emphasis added); *see also Carrera*, 727 F.3d at 308 n.2 ("Although some evidence used to satisfy ascertainability, such as corporate records, will actually identify class members at the certification stage, ascertainability only requires the plaintiff to show that class members can be identified.").

[228] 784 F.3d 154 (3d Cir. 2015).

[229] *Id.* at 159.

[230] *Id.* at 160.

[231] *Id.*

[232] *Id.* at 166–68.

[233] *Id.* at 169 (quoting *Byrd v. Aaron's, Inc.*, No. 11-101, 2014 WL 1316055, at *5 (W.D. Pa. Mar. 31, 2014), *rev'd and remanded*, 784 F.3d 154 (3d Cir. 2015)).

[234] *Byrd*, 784 F.3d at 169 (citing *Grandalski*, 767 F.3d at 184 n.5)).

[235] 867 F.3d 434 (3d Cir. 2017).

[236] *Id.* at 436–37.

[237] *Id.* at 437.

[238] *See City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, No. 13-4595, 2015 WL 5769951, at *3 (D.N.J. Sept. 29, 2015), *vacated in part*, 867 F.3d 434 (3d Cir. 2017).

[239] *City Select*, 867 F.3d at 441.

[240] *Id.*

[241] *Id.* (emphasis added).

[242] *Id.* at 442.

[243] *Id.*

[244] Our Court of Appeals also addressed ascertainability in *Grandalski v. Quest Diagnostics Inc.*, but there it mostly focused on the difference between the ascertainability and predominance requirements. 767 F.3d 175, 184–85, 184 n.4 (3d Cir. 2014).

[245] *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823 (1985) (holding the "constitutional limitations" regarding choice of law "must be respected even in a nationwide class action"); *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996) (explaining the court must apply an individualized choice of law analysis to each plaintiff's claims), *aff'd sub nom. Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997).

[246] ECF Doc. No. 95-1 at ¶ 14.

[247] *Id.* at ¶ 16.

[248] *Id.* at ¶ 14.

[249] *Id.* at ¶ 10.

[250] *Byrd*, 784 F.3d at 170–71.

[251] *Id.* at 170.

[252] *Id.* at 171 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012)).

[253] *Id.* (emphasis in original).

254 *City Select*, 867 F.3d at 442.

255 *Id.*

256 *Id.* at 442 (emphasis added).

257 *Id.* at 442 n.4 (emphasis added).

258 We do not preclude the Estate from seeking affidavits, as they would provide added indicia of reliability supported by Wells Fargo's records. *See Carrera*, 727 F.3d at 306.

259 *Gibbons v. Weltman, Weinberg & Reis Co., LPA*, No. 17-1851, 2018 WL 5720749, at *11 (E.D. Pa. Oct. 31, 2018) (certifying class of customers who received an allegedly violative debt collection letter to collect consumer debts within a certain geographic area in a certain timeframe which could be ascertained using the defendant's records.)

260 *See, e.g.*, *Fenwick v. Ranbaxy Pharm., Inc.*, 353 F. Supp. 3d 315, 324–25 (D.N.J. 2018); *In Re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *22 (D.N.J. Oct. 30, 2018); *In re Domestic Drywall Antitrust Litig.*, No. 13-2437, 2017 WL 3700999, at *9–10 (E.D. Pa. Aug. 24, 2017).

261 *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016).

262 *Id.* at 249–50 (internal quotations omitted).

263 *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

264 *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 291 (W.D. Pa. 2014) (quoting *Wal-Mart Stores, Inc v. Dukes*, 564 U.S. 338, 350 (2011)).

265 *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

266 *Barel v. Bank of Am.*, 255 F.R.D. 393, 398 (E.D. Pa. 2009) (alteration in original) (quoting *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001)).

267 ECF Doc. No. 96 at 11.

268 *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 476 (E.D. Pa. 2009) (internal quotations omitted).

269 13 Pa.C.S.A. § 9628(b)(1).

270 *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012).

271 *Id.*

272 *In re Gen. Motors Corp.*, 55 F.3d at 800.

273 *Georgine*, 83 F.3d at 630.

274 *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010).

275 Fed. R. Civ. P. 23(g)(1)(A)(i–iv).

276 Fed. R. Civ. P. 23(g)(1)(B).

277 ECF Doc. No. 96 at 25.

278 ECF Doc. No. 115.  We denied the Estate's Motion.  ECF Doc. No. 125.

279 Attorney Fabian has yet to enter an appearance despite submitting a verification.

280 *See, e.g.*, ECF Doc. No. 86 at 59 of 64, ¶ 8 ("class sertifiacyion [sic]"), *id.* at ¶ 10 ("my work before the trials [sic] courts"), *id.* at ¶ 11 ("I also devoted considerable time to propounding discovery requests and analyzing the results of that discover [sic], in addition to responding the [sic] discovery served of [sic] the classes.").

281 ECF Doc. No. 86 at 59 of 64 ¶ 8 ("I performed legal research under both federal and state law as to both the substantive issues in each case and the specific class action issues, including class sertifiacyion [sic] and one-way intervention, that arose [sic]").

282 ECF Doc. No. 103 at 12 ("Wells Fargo's contention that it voluntarily [sic] a random sampling of notices. [sic]   Is an utter falsehood. [sic]").

283 *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (quoting *Szczubelek v. Cendant Mort. Corp.*, 215 F.R.D. 107, 119 (D.N.J. 2003)).

284 *Bordeaux v. LTD Fin. Servs., L.P.*, No. 2160243, 2017 WL 6619226, at *4 (D.N.J. Dec. 28, 2017).

285 *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973); *see also New Directions Treatment Servs.*, 490 F.3d at 313.

286 ECF Doc. No. 82-1 at 49 (N.T. L. McDonald, Nov. 12, 2018).

287 *Id.* at 10.

288 *Id.* at 11.

289 *Id.* at 52–56.

290 *Pagan v. The New Wilson's Meats, Inc.*, No. 08-0751, 2011 WL 1876027, at *8 (E.D. Pa. May 17, 2011).

291 *Id.* at 252 (collecting cases).

[292] ECF Doc. No. 96 at 23.

[293] *Amchem Prod.*, 521 U.S. at 625.

[294] *Dewey*, 681 F.3d at 184 (internal quotations omitted).

[295] *Id.*

[296] *Id.*

[297] *Negrete v. Allianz Life Ins. Co. of N. Am.*, No. 05-6838, 2013 WL 3353852, at *4 (C.D. Cal. July 3, 2013) (quoting 1 NEWBERG ON CLASS ACTIONS § 3:71 (5th ed.)).

[298] *Kaplan v. Pomerantz*, 131 F.R.D. 118, 123 (N.D. Ill. 1990).

[299] Though we ultimately decline to certify a class due to a lack of predominance, our adequacy analysis would not preclude objectors from being heard had we certified a class and the parties settled.

[300] The predominance inquiry is not to be confused with the ascertainability requirement—"[t]he ascertainability requirement pertains to membership in the proposed class, whereas predominance pertains to eliminating or minimizing individual issues that would be involved in determining liability." *In re Domestic Drywall Antitrust Litig.*, 2017 WL 3700999, at *7.

[301] *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3d Cir. 2016) (quoting *Amchem*, 521 U.S. at 623).

[302] *Id.* (internal quotations omitted).

[303] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

[304] *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015). Although the Supreme Court has held damages must be "susceptible of measurement across the entire class," *Comcast Corp.*, 569 U.S. at 34, our Court of Appeals has interpreted *Comcast*'s holding as specific to antitrust claims. *Neale*, 794 F.3d at 374.

[305] *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004), *abrogation on other grounds recognized by In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 318 n.18.

[306] The Estate invokes both § 9610 and § 9611 in its Amended Class Action Complaint, although its claim cites only section 9610. *See* ECF Doc. No. 12 at 13–14 (§ 9610); ¶ 22 (§ 9611).

[307] 13 Pa.C.S.A. § 9610.

[308] 13 Pa.C.S.A. § 9610(b).

[309] 13 Pa.C.S.A. § 9611 (emphasis added).

[310] 13 Pa.C.S.A. § 9611(b).

[311] 13 Pa.C.S.A. § 9625 cmt. 2.

[312] 13 Pa.C.S.A. § 9625(b).

[313] *Savoy v. Beneficial Consumer Disc. Co.*, 468 A.2d 465, 467 (Pa. 1983) (emphasis added); *see also Fid. Consumer Disc. Co. v. Clark*, 482 A.2d 580, 583 (Pa. 1984).

[314] *Solfanelli v. Corestates Bank, N.A.*, 203 F.3d 197, 200 (3d Cir. 2000).

[315] 13 Pa.C.S.A. § 9627 cmt. 2.

[316] *Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F. Supp. 813, 833–34 (E.D. Pa. 1993) ("The issue of commercial reasonableness is somewhat more problematic and, to a large extent, more frequently resolved on a *case by case basis*." (emphasis added)); *Savoy*, 468 A.2d at 467.

[317] 13 Pa.C.S.A. § 9625(b).

[318] Judge Schiller certified a settlement class under the Pennsylvania Commercial Code. *See Cosgrove*, 2011 WL 3740809, at *5. But in the context of settlement. And earlier in the case, Judge Schiller found a technical violation of the MVSFA did not render the notice *per se* unreasonable. *See Cosgrove v. Citizens Auto. Fin., Inc.*, No. 09-1095, 2010 WL 3370760, at *4 (E.D. Pa. Aug. 26, 2010) (determining defendant's failure to notify plaintiff of its right to reinstate a contract under the MVSFA did not render the defendant's notice unreasonable).

[319] 13 Pa.C.S.A. § 9613(1).

[320] 13 Pa.C.S.A. § 9613 cmt. 2.

[321] 13 Pa.C.S.A. § 9612(a); 13 Pa.C.S.A. § 9613(2).

[322] *Hudson v. Eaglemark Sav. Bank*, No. 10-6994, 2011 WL 1755540, at *5 (E.D. Pa. May 9, 2011), *aff'd*, 475 F. App'x 423 (3d Cir. 2012).

[323] *Fred Beans*, 183 F. Supp. 3d at 700 (quoting *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964)).

[324] *Duane Morris, LLP v. Todi*, No. 001980 2001, 2002 WL 31053839, at *5 (Pa. Com. Pl. Sept. 3, 2002) (compiling federal cases holding the same).

[325] ECF Doc. No. 82-8 at 149a.

[326] *Cf. Fred Beans*, 183 F. Supp. 3d at 695, 700 (granting summary judgment to defendant on conversion claim where plaintiff consented to repossession of her vehicle where plaintiff texted the repossession agent "he could come and get the vehicle").

[327] *Pikunse v. Kopchinski*, 631 A.2d 1049, 1051 (Pa. Super. Ct. 1993).

[328] *Id.* at 1052.

[329] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001) (quoting Fed. R. Civ. P. 23(b)(3)).

[330] *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998) (internal quotations omitted).

[331] *American Pipe & Construction. Co. v. Utah*, 414 U.S. 538 (1974).

[332] *See In re Wellbutrin XL Antitrust Litig.*, 268 F.R.D., 539, 545 (E.D. Pa. 2010).

[333] *United States v. Alcan Aluminum, Co.*, 25 F.3d 1174, 1181 n.9 (3d. Cir. 1994).

[334] Fed. R. Civ. P. 24(b).

[335] *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983).

[336] *Lindblom v. Santander Consumer USA, Inc*, No. 15-00990, 2018 WL 3219381, at *6 (E.D. Cal. June 29, 2018) (denying motion to intervene in a class action, noting "[t]he Court is unaware of any case holding that the Court should consider potential impairment to a would-be class member for purposes of permissive intervention").

[337] 138 S. Ct. 1800 (2018).

[338] *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804, 201 L. Ed. 2d 123 (2018).

[339] This trial date may need to change, but we expect trial will occur before mid-summer 2019.